BRUNOT, J.
 

 The litigants are nonresident corporations. The National Park Bank is domiciled in New York, the Concordia Land
 
 &
 
 Timber Company in Wisconsin, and the Black River Lumber Company in Delaware. Each corporation was organized under the laws of the state in which it is domiciled. The Concordia Land & Timber Company and the Black River Lumber Company complied with the laws of Louisiana and were authorized to do business in this state. Both the Concordia Land & Timber Company and the Black River Lumber Company owned property in Concordia parish, La., and there conducted business.
 

 The National Park Bank is the holder and owner of a series of past-due notes, made and executed by the Jeffris Lumber Company unconditionally indorsed by the Concordia Land & Timber Company. Following ■the maturity of all of the notes of this series, the Jeffris Lumber Company was declared a bankrupt, and in the liquidation of the affairs of the bankrupt the National Park Bank received 20.1 per cent, of the total sum represented by said notes, leaving a balance due thereon of. $56,517.04. The National Park, Bank sued the indorser of the notes, the Concordia Land & Timber Company, in the district court of Concordia parish, for this balance, attached the property of the defendant, cited it through a curator ad hoc, and served garnishment proceedings upon the Black River Lumber Company. The defendant did not appear or answer the suit; and the garnishee did not file answers to the interrogatories served upon it; thereupon plaintiff entered a preliminary default as to the defendant, and, the defendant still failing to appear or answer, the plaintiff proved its demands, and the court rendered a final judgment against t^ie defendant for the full amount of its claim, and a like judgment, pro confesso, against the garnishee. A few days after the rendition of this judgment, the garnishee filed answers to the interrogatories propounded to it by the plaintiff. It is not necessary to mention the suit to annul and the proceedings which immediately followed, as this court disposed of them in the case of National Park Bank v. Concordia Land
 
 &
 
 Timber Co., 154 La. 31, 97 So. 272; Black River Lumber Co. v. National Park Bank, 154 La. 31, 97 So. 272.
 

 About the time the opinion in the cited ease was handed down, the Concordia Land & Timber Company filed a suit against the Black River Lumber Company. The petition charges that the Black River Lumber Company cut and removed from certain described lands 3,225,000 feet of timber owned by the
 
 *93
 
 petitioner; that the timber was cut and removed without the knowledge or consent of petitioner; that it was well ¡worth, as lumber, at the nearest shipping point, $600,000; and the prayer of the petition is for a judgment in favor of petitioner and against the Black River Lumber Company for that sum, with 5 per cent, per annum interest thereon from January 1, 1920, until paid. For answer, the defendant admits that it cut and removed 3,224,127 feet of timber from portions of the land described in the petition, but it denies that the timber so cut and removed was owned by. plaintiff, and it avers that all of the timber was cut and removed during the years 1918 and 1919. Defendant admits that it is a nonresident corporation, that it has an office, domicile, and agent in Louisiana; and that it is doing business in this state; but it denies all other allegations in the petition. Defendant pleads the prescription of one year as a bar to the claim sued upon, and,' as plaintiff in reeonvention, the defendant prays for a judgment in its favor and against the Concordia Land & Timber Company for $56,104.62, with interest on $45,370 at the rate of 7 per cent, per annum from about June 15, 1918, and a like interest on $2,500 from December 9, 1917, and 6 per cent, per annum interest on the following sums: $2,474.72 from November
 
 5,
 
 1916, and $3,059.90 from November 27, 1917.
 

 The eases were consolidated, and the trial resulted in a judgment dissolving the attachment sued out by the National Park Bank against the Black River Lumber Company, garnishee, and rejecting its demands against the garnishee; sustaining the plea of prescription filed by the Black River Lumber Company, in bar of the suit against it by the Concordia Land & Timber Company; rejecting the demands of the plaintiff in that suit; sustaining the plea of prescription to a part of the reconventional demand of the Black River Lumber Company; awarding that company a judgment, as plaintiff in reeonvention, against the Concordia Land .& Timber Company for $26,432.52, with reservation of the right of plaintiff in reeonvention to sue for any balance which may thereafter be due it under the Concordia Land & Timber Company’s contract of suretyship entered into May 16, 1917; and taxing the National Park Bank with the costs of the garnishment proceedings and the Concordia Land & Timber Company with all other costs.
 

 From this judgment the National Park Bank and the Concordia Land & Timber Company have appealed.
 

 The two cases present a number of interesting questions, but if it be found that the plea of prescription filed by the Black River Lumber Company was properly sustained, the tireless labor of counsel and the wide research they have made in marshaling decisions for this court’s guidance must be regarded as a labor of love rather than of practical value, because, if the Concordia Land & Timber Company’s right of action against the Black River Lumber Company was prescribed, there is no bone over which there can be a contention between the National Park Bank and the garnishee, and there will remain only one question to be decided in the suit of the Concordia Land & Timber Company against the Black River Lumber Company, viz.: Whether the Black River Lumber Company is entitled to a judgment in its favor on its reconventional demand in that suit.
 

 We will therefore dispose of the plea of prescription before considering the other questions raised by the pleadings. For this reason it is not necessary to enumerate at this time the other pleas filed and the several issues presented by them.
 

 The plea of prescription is based upon Civil Code, arts. 3534, 3536, and article 3537, as amended by Act 33 of 1902. These articles of the Code treat of the prescription of one year, and article 3537, C. C., is as follows:
 

 
 *95
 
 “The prescription mentioned in the preceding article runs:
 

 “With respect to the merchandise injured or not delivered, from the day of the arrival of the vessel, or that on which she ought to have arrived.
 

 “And in the other cases from that on whiqh the injurious words, disturbance or damage were sustained.
 

 “And where land, timber or property has been injured, cut, damaged or destroyed from the ■date knowledge of such damage is received by the owner'thereof.”
 

 The learned district judge considered the( plea of prescription in connection with the garnishment proceedings and the suit of the National Park Bank v. Concordia Land
 
 &
 
 Timber Co. and Black River Lumber Co. v. National Park Bank, and said:
 

 “There can be no question but that the garnishment was that of an unliquidated claim for damages arising out of a tort, and so is also the demand of the Concordia Land & Timber Company one for unliquidated damages, growing out of an alleged tort—the tort in the two cases constituting one and the same transaction.”
 

 The judge quotes article 28 of the Code of Practice, and finding that no contractual relation whatever existed between the Concordia Land & Timber Company and the Black. River Lumber Company, he properly held:
 

 “That the act of the Black River Lumber Company in the cutting and removing the timber in the manner charged in the petition was either 'an offense or quasi offense.”
 

 Offenses and quasi offenses are torts. According to Mr. Bishop:
 

 Tort “denotes an injury inflicted otherwise .than by a mere breach of contract; or to be more nicely accurate, a tort is one’s disturbance of another in rights which the law has ■created, etc.”
 

 Am. & Eng. Ency. vol. 28, p. 255, distinguishes a tort from a breach of contract as follows:
 

 “A tort, may be distinguished from a (breach ■of contract in that the right of action in the latter case arises out of the agreement of the parties, whereas the right of action for a tort arises out of a duty fixed by law and independent 'of the will of the parties.”
 

 Judge Cooley says:
 

 “Certain acts or omissions are made public offenses by the common law or by statute, either because their inherent qualities and necessary tendencies make them prejudicial to organized society, or because it is believed that the evils likely to flow from them will be so serious that the general good will be subserved by forbidding them, and penalties are attached to them, which are imposed on public grounds. These according to their grade, are crimes or misdemeanors, or they are simply things prohibited under penalty. But where the same wrongful acts cause damage to private individuals, they come directly within the definition of torts, and are such.” Cooley on Torts (2d Ed.) 81.
 

 The suit of the Concordia Land & Timber Company against the Black River Lumber Company is an action for unliquidated damages growing out of the commission of a tort by the defendant. Actions of this character are barred by the prescription of one year.
 

 The district judge has so accurately and exhaustively reviewed the testimony and disposed of all pleas and demands necessary to a proper decision of the case that we quote, with approval, his reasons and conclusions, as follows:
 
 *99
 
 doubt of the truthfulness of their testimony, especially as three of them were disinterested in the results of the trial of this case. The court therefore finds that the plaintiff had knowledge of the trespass, the subject of this litigation, for more than two years before the institution of this suit, and that the plaintiff the Concordia Land & Timber Company, upon whom, under the authority of Citizens’ Bank v. Jeansonne, 120 La. 393 (45 So. 367); Louisiana Stave Co. v. So. Ark. Lumber Co., 135 La. 232 (65 So. 226); Antrim Lumber Co. v. Bollinger, 121 La. 306 (46 So. 337); Ducros v. St. Bernard Lumber Co., 145 La. 694 (82 So. 841); and Porier v. Burton-Swartz Cypress Co., 127 La. 936 (54 So. 292), rested the burden of proving, with reasonable legal certainty, the date when it received knowledge that its timber, tortiously cut and converted by the Black River Company has failed to discharge that burden.
 

 
 *95
 
 “The cutting and removing of the timber in question having occurred more than one year before the suit of the Concordia Land & Timber Company was filed, it first becomes necessary, in order to fix a beginning of the one-year prescriptive period, to ascertain from the evidence in the case the date when the Concordia Land & Timber Company first had knowledge of the trespass, or damage to its timber by the cutting, removing, and conversion of the same.
 

 “Upon this point, we have the testimony of eight witnesses, the first three of whom, E. J. Lundin, J. C. Ulrich, and Donald H. Jeffris, testified for the plaintiff; the other five, R. R. Speed, A. J. Renaud, R. L. Crowell, B. E. Masters, and M. G. Jeffris, testified for the defendant and garnishee.
 

 “E. J. Lundin testified that from July, 1918, to August, 1922, he was a stockholder, director, and secretary of the Concordia Land
 
 *97
 
 & Timbef Company; that he had no knowledge that the timber had been cut until he was informed of it by B. E. Masters at a lunch in Hotel Brevoort, in Chicago, in the latter part of September, 1923. There was no discussion of the cutting of the Concordia Band & Timber Company’s timber by the Black River Lumber Company at any of the meetings of the directors and stockholders of the Concordia Land & Timber Company. When asked, on cross-examination, how many of such meetings, when and where held between June, 1918, and August, 1922, he replied: ‘The minute book- of the corporation would be the best evidence as to that. I have not the minute book, nor have I access to it.’
 

 “Considering the fact that this witness was stockholder, director, and secretary of the Concordia. Land & Timber Company, and that this suit of the Concordia Land & Timber Company against the Black River Lumber Company, No. 4431, for this tort, was filed six months before the witness claims to have had any knowledge of the trespass, it is evident that this witness was either very ignorant and indifferent to the affairs and business of his company, or that it raises a strong suspicion of doubt as to the verity of his testimony, when he says the first knowledge he had of the timber depredations was in the latter part of September, 1923, for doubtless the suit was authorized by a resolution of the company’s directors.
 

 “J. C. TJlrich, who was also a stockholder, director, and treasurer of the Concordia Land & Timber Company, testified that he had no knowledge of the trespass in question until the latter part of September, or the first of October, 1923, which was six months, or more, after suit No. 4431 was filed in this court. He was asked the same question when testifying under depositions, as were propounded to the witness Lundin, and the replies of this witness to the questions were practically and substantially the same as were the replies of Lundin; hence, whalt is said by the court in reference to Lundin’s testimony will apply with equal force to that of J. 0. pirich.
 

 • -“Donald H. Jeffris, who was the son of D. K. Jeffris, president of the Concordia Land
 
 &
 
 Timber Company up to the time of the latter’s death in October, 1921, and who was closely associated in business with his father for some years, and who was also a stockholder, officer, and director of the company, testified that he (the witness) was a stockholder, director, and officer of the Concordia Band & Timber Company from June, 1918, to August, 1922; that the first knowledge that he had of the cutting and conversion of the Concordia Land & Timber Company’s timber by the Black River Lumber Company was in the nature of a rumor which came to him in the fall of 1920 while at Cairo, HI., and which rumor he at the time and place imparted to his father, D. K. Jeffris, then the president of the Concordia Land & Timber Company. He says this was the first information which he or his father had received about the matter, and that if he and his father had had any idea that any considerable quantity had been cut they would have looked into it< immediately.
 

 “In interrogatory No. 7 he was asked: ‘When did the Concordia Land & Timber Company first receive knowledge that its timber in Concordia Parish, La., or any part of its timber, had been cut by the Black River Burner Company, since July 1, 1918?’ He replied to this question: ‘Some two or thrfee months during the first part of 1923.’ This answer seems somewhat to conflict with his answer to the sixth interrogatory, and cannot be reconciled with it, except on the theory that his company had no knowledge as to the extent of the timber depredations until the latter part of 1922, or the first two or three months of 1923. He further said that from June, 1918, to August, 1923, the matter of the timber cutting had not been discussed at any stockholders’ meeting from June, 1918, to August, 1922, but when asked how many of such meetings were held during that period and when and where held, he, like Lundin and Ulrich, didn’t even approximately attempt to answer the question, but like those two witnesses sought to evade the question in the same manner as they had done. These three witnesses were the only stockholders. officers, and directors of the company at the time inquired about. D. K. Jeffris, its former president and other stockholder, having died in 1921, it is rather strange, to say the least, that some one of these three witnesses did not have control of and access to the minute book and records of the company, and could have produced copies from them, especially as they were asked so to do.
 

 “M. G. Jeffris, the brother of D. K. Jeffris, who was at one time a large stockholder of the Concordia Land & Timber Company, and who ceased to be such some time in 1918, testified that D. K. Jeffris, who was president of the Concordia Land & Timber Company, at his office in Chicago t ‘Some time during the year, 1920, told me that the Black River Lumber Company had cut this released timber, and he was going to sue them for the timber. We had a talk of some length on the subject, and I told him if I were in his place, I would forget Concordia, get away from it, devote his time
 
 *99
 
 and attention to other business matters, and that I would not bother my head about the matter if I were in his place. He stated that the Armour people had not done as they agreed with him, and he proposed to sue them for this trespass. I tojd him that the Armour people had carried out their agreement made with me, and that was all I knew about it, and I again advised him to drop the whole matter and forget it.’
 

 “ This testimony was- objected to, if the court remembers correctly, on the ground that it was a privileged communication between attorney and client, but was allowed subject to objection. As the other evidence in the case, especially that of D. H. Jeffris to the effect that M. G. Jeffris was the legal and confidential adviser of D. K. Jeffris and the Concordia Land & Timber Company, does not make it clear under what circumstances the above conversation took place, or whether at that particular time M. G. Jeffris was acting as legal adviser to D. K. Jeffris or the Concordia Land & Timber Company, or that the conversation and advice above related was only such as would naturally occur between two brothers, the court has concluded to consider and give such weight to the testimony of this witness as to that of any other equally credible and uneontradicted witness, especially as'the rule invoked to exclude this testimony is one which ought not to be applied except in very clear cases coming strictly, by the proof, within the letter of the law. The testimony of Speed, Renaud, Crowell, and Masters, all defense witnesses, is that some time in 1920 they each heard D. K. Jeffris, the president of the Concordia Land & Timber Company say the Black River Lumber Company had cut the timber on the land which had been released from the mortgage of the Continental & Commercial Trust & Savings Bank.
 

 “The testimony of Lundin and Ulrich only to their own personal knowledge and in the nature of the ease, it was impossible for them to testify, as they did not attempt to do, that D. K. Jeffris, the president of the company, did not have knowledge of the trespass in question as early as some time in 1920, as, testified to by the other six witnesses.
 

 “True, the testimony of the six witnesses relates to the declarations made by a party since deceased, and on that account ought to be received with caution; yet we think they so unanimously corroborate each other as to the time D. K. Jeffris, the president of the company, had knowledge of this timber cutting and conversion by the Black River Lumber Company, that there can hardly be any
 

 “Under the following authorities the knowledge of a president of a corporation relating to its affairs and business is knowledge to the corporation: Serio v. American Brewing Co., 141 La. 290 (74 So. 998); L. R. A. 1917E, 516; 131 La. 62 (58 So. 1033); Ann. Cas. 1914D, 1290; 132 La. 949 (61 So. 988); 52 A. 36 (26 So. 800); 121 La. 311, 312.
 

 “ ‘Notice of facts which ought to excite inquiry, and which, if pursued, would lead to knowledge of other facts operates as notice thereof.’ 203 Ala. 253 (82 So. 495); 200 Ala. 511 (76 So. 453); 70 So. 669; 55 So. 190; 101 U. S. 135; 31 A. 149; 10 Cyc. 1054, 1055, 1059.
 

 “So then, under these last-cited authorities, when D. K. Jeffris, the president of the Concordia Land & Timber Company, as testified to by D. H. Jeffris, ‘heard a rumor in 1920’ that there had been some cutting of his company’s timber, did not know the extent of the trespass, it then devolved upon him to make an investigation of this rumor as to the amount of timber that had been cut, and if he failed to do so, neither he nor his company can be excused for this neglect, but will be held to have had knowledge, as early as 1920, of the extent of timber depredations by the Black River Lumber Company.
 

 “Hence, the court finds, and so holds, that the action of the Concordia Land & Timber Company against the Black River Lumber Company, being suit No. 4431 of the docket of this court, is prescribed by the one-year prescription of Civil Code, 3536 and 3537, as amended by Act 33 of 1902, unless this prescription was interrupted by the garnishment of the National Park Bank, in its suit against
 
 *101
 
 the Concordia Land & Timber Company, Black River Lumber Company, Garnishee, being No. 4291 of the docket of this court, which was filed and served on the Black River Lumber Company on March 14, 1921, which was less than one year after the Concordia Land & Timber Company had knowledge through its president, of this trespass.
 

 “If the garnishment effected a valid and legal seizure of the Concordia Land & Timber Company’s claim for unliquidated damages for the tort committed by the Black River Lumber Company, then, in that event, the court without hesitation would unquestionably hold that the garnishment interrupted prescription. But did the garnishment have that effect? Was it, or not, absolutely null and void, without any legal effect whatever?
 

 “The authorities are very numerous to the point that a claim for unliquidated damages arising out of a tort cannot be reached by garnishment, or seized under fieri facias, or attachment, as was attempted to be done in this case, in the hands of a third person against whom the defendant might claim to have such a 'demand. This seems to be, not only the law of this state, as settled by its jurisprudence, but also of nearly all, if not all, of .the other states; in support of the proposition we cite Peet, Yale & Bowling v. McDaniel, 27 A. 455; Liminet v. Fouchy (Dumas et al., Garnishees) 51 A. 1299 (26 So. 87); Charles Madnel, Executor, v. Monsseaux (Union Ins. Garnishee), 29 A. 228 ; 28 C. J. p. 137, § 175; and the authorities cited in notes 73, 74; 20 Cyc. 1003, § 6, and authorities cited in note 22; 25 R. C. L. p. 797, § 26; and 59 L. R. A. pp. 355-359; Katz & Barnett v. Sorsby, 34 A. 588.
 

 “And why is this so? Is it not because the plaintiff in garnishment, usually even in cases where the garnishment is not a claim such as we are now discussing, does not know whether the garnishee owes anything at all to the defendant, but only believes that the garnishee is indebted to the defendant", and because of this want of knowledge cannot make a positive, affirmative demand upon the garnishee for any specific definite demand for any particular sum of money whatever, but must content himself with questions, not demands, addressed to 'the garnishee calling upon him to disclose under oath what, if anything, he may owe to the defendant? Prom the very nature of the proceeding it can, in no sense, be properly termed a suit. It is, if the claim be one of such nature as can be reached by garnishment, nothing more, nor less, than a seizure.
 

 “The garnishment does not really become a suit until the answers of the garnishee are traversed by the plaintiff in such manner as would set forth a cause of action against the garnishee as fully and completely as would have been required of the defendant had he brought the suit himself, in his own name, directly against the defendant. If this were not true, the plaintiff in garnishment, who only stands in the shoes of the defendant, and who can exercise no greater or higher right than the defendant himself could exercise against’ his debtor, would be highly favored over the defendant.
 

 “Another reason why the garnishment of an unliquidated" claim for damages arising out of a tort is an absolute nullity is because the garnishee, who is only required to answer under oath (not an affirmative, positive demand for any specific and definite sum of money), does not know, and cannot know, how much, if anything, he may owe to the defendant. This can only be known after the amount is fixed by judgment in a suit brought by the defendant himself against the garnishee and in which a cause of action is fully and fairly stated. A garnishment in a case of this kind we are now considering cannot be supported by those decisions which hold that a suit instituted in a court without jurisdiction will interrupt prescription. Those decisions proceed upon the theory that the plaintiff has a cause of action which he has stated and can prosecute in some court other than that in which the suit was instituted. * But we have no such case here. No court anywhere could have legally issued this garnishment. It is, from its very nature, absolutely and essentially null and void, produeing no effect whatever, regardless of what court before brought.
 

 “In Edwards v. Ross, 58 Ga. 147, the court held: ‘The bar of the statute of limitation is not prevented by a void attachment,’ (as was the case in the garnishment proceeding in the case at bar), ‘having been seasonably sued out, a declaration filed thereon, the defendant’s administrator brought in by consent, and the proceedings dismissed less than six months prior to the bringing of the action in which the statute is set up. The attachment having been adjudged void, it is lifeless for any purpose, and the subsequent action is not a renewed case but a first independent suit.’
 

 “The interrogatories propounded to the Black River Lumber Company, the garnishee, certainly stated no cause of action whatever, not only because the thing sought to be attached was a claim for unliquidated damages arising out of a tort, which could not bo reached by garnishment, but also because the
 
 *103
 
 interrogatories contained no affirmative, positive demand for any specific, definite amount, or contained a single material allegation which would even tend in the least degree to state a cause of action.
 

 “This being so, admitting for argument’s sake that the traverse filed to the answers of
 
 the garnishee can be
 
 regarded as an amendment, which fully stated á cause of action where none whatever was previously stated . in, the interrogatories, the traverse being filed on May 12, 1923, after the expiration of the prescriptive period, did not relate back to the time of serving the interrogatories on the Black River Lumber Company and did not have the effect of interrupting the prescription.
 

 “The authorities are numerous to the effect that where the original bill of complaint, or petition, is brought before the prescriptive period has expired, or petition is amended after the expiration of the prescriptive'period so as to state a cause of action, the amendment will relate back to the time of filing the original pleading and save the action from the bar of the statute of limitations, but that it - (the amendment) will not relate back to the time of filing the original pleadings so as
 
 to save the
 
 action from the bar of the statute of limitations, where the original pleading fails to state any cause of action whatever. 25 Cyc. pp. 1305, 1306, 1307, 1308, 1309; 3 L. R. A. footnotes on pages 297-304; Haggonner v. Detroit Copper Mining Co. of Arizona, Ann. Cas. 1914C, p. 1016, and note; Carlin v. City of Chicago, Ann. Cas. 1915B, p. 213, and note.
 

 “Garnishment in its inception amounts to, if anything at all, only a seizure; it does not rise to the dignity of a suit until the answers of the garnishee are traversed in such manner as to set forth a cause of action against
 
 him.
 

 “In the ease at bar, if we regard the traverse as an amendment relating back to the time of the filing and serving the interrogatories, it cannot have the effect of interrupting prescription, because there is absolutely no cause of action, not even imperfectly, stated in the interrogatories which were filed and served within the prescription period.
 

 “If the traverse in the instant ease be regarded as the beginning of the action, and not as an amendment to the interrogatories, it cannot have the effect of interrupting prescription for the very simple reason' that it was only filed more than a year after the prescriptive period had expired.
 

 “But if we regard it as an amendment of the interrogatories, the situation will not be improved not only because the interrogatories set forth no cause of action whatever, but for the further reasons that the traverse itself was wanting in every essential allegation to state a cause of action, as heretofore noted in this opinion.
 

 “If we understand the law correctly, a traverse, to be properly and effectively drawn, should contain every essential and material allegation which would be required to be stated in a petition, had the defendant himself instituted the action in his own name against his debtor, the garnishee. If this were not so, the defendant in garnishment, who stands in the shoes of the defendant, and can exercise no higher or greater right than that individual could exercise, would be highly favored over him.
 

 “It is not every Judicial demand which will interrupt prescription, but is such demand, even though imperfectly stated, as will fairly apprise the defendant of what is demanded of him; ,but where, as in this case, there is no affirmative, positive demand for any specific, definite thing, or sum of money, either in the interrogatories or the traverse to them, there can be no interruption of prescription.
 

 “This garnishment did
 
 not prevent or
 
 hinder the Concordia Land & Timber Company from instituting its suit at any time'before the prescriptive period of one year, counting from 1920, 'had elapsed, for there was nothing taken by the garnishment. Hence the court holds that not only must the peremptory exception filed by the garnishee, which has been herein herebefore quoted, be sustained, but also that the action of the Concordia Land & Timber Company v. The Black River Lumber Company, being suit No. 4431 of the docket of this court, is barred by the prescription of one year; the estoppel filed by the plaintiff to this plea of prescription not being supported by any evidence filed in this court.
 

 “Taking up for consideration the five years prescription pleaded in bar of the reconventional demand of the Black River Lumber Company, filed May 27, 1923, based upon the four notes, aggregating in principal $10,734.62, and which are fully described in the defendant’s answer in suit No. 4431 the court finding that this demand was not made until after the expiration of more than five years reckoning from the date of maturity, which is March 27, 1918, of the last maturing one of the said notes, and that there were no payments or acknowledgments made which would interrupt the prescription, holds that the plea as to the said four notes must be sustained.
 

 “Considering the reeonventional demand in
 
 *105
 
 said suit for $45,370, the court finds the facts relating thereto to be:
 

 “That on May 16, 1917, the Concordia Land & Timber Company and the Jeffris Lumber Company made a written contract with each other whereby the former leased to the latter its saw-mill and all of its timber lands in Concordia parish, aggregating approximately 43,-000 acres, fully described in the contract, for a term expiring in 1946, for a nominal consideration, expressed in the contract and conferred upon the Jeffris Lumber Compaby for a price of $3 per thousand feet log scale, to be paid to the Concordia Land & Timber Company, the right to cut and deliver to that company all of the merchantable, standing green timber on the said lands.
 

 “There were many other provisions contained in the contract, not necessary to recite.
 

 “On the same day, May 16, 1917, the Jeffris Lumber Company and Rathborne, Hair & Ridgway Company entered into a contract wherein, in consideration of a loan of $62,000 from the latter company to the former, it was agreed between the two companies that the Jeffris Lumber Company would cut and deliver to Rathborne, Hair & Ridgway Company not less than two and one-half million feet, at a price of $9.50 per one thousand feet, of the green gum timber growmg_ upon the lands of the Concordia Land & Timber Company described as in the contract between the Concordia Land & Timber Company and the Jeffris Lumber Company, of May 16, 1917, the said quantity of two and one-half million feet to be delivered each year during the life of the contract, which was to terminate in 1946, until all of the green gum timber on said lands, estimated at between sixty-five and eighty million feet, should be so cut and delivered. The said loan of $62,000 was to be used in paying off, to that extent, the bonded indebtedness, secured by mortgage upon the said timber lands, of the Concordia Land & Timber Company held by the Continental & Commercial Trust & Savings Bank of Chicago. The evidence establishes that the said sum so loaned was used as intended. In the contract it was agreed that this loan of $62,000 should be reimbursed to Rathborne, Hair & Ridgway Company by the Jeffris Lumber Company by a deduction of $3 per thousand feet on the gum logs to be delivered under the contract, until the said deduction should fully pay the $62,000 with 3 per cent, per annum interest thereon. There were also other provisions in this contract not necessary to recite.
 

 “On the same day, May 16, 1917, by written contract, the Concordia Land & Timber Company guaranteed the full performance by Jeffris Lumber Company of the latter company’s contract with Rathborne, Hair & Ridgway Company, and consented that ■ the $62,000 so loaned and used, should constitute a lien upon the said timber lands of the Concordia Land & Timber Company, subject, however, to the mortgage held by the Continental & Commercial Trust & Savings Bank.
 

 “The evidence shows that in June, 1918, there was paid on this loan. $18,567.48, leaving a balance in principal of $43,432.52; that of the said amount paid, $11,409.09 was paid in two dividends out of funds distributed by the bankrupt court in the bankruptcy proceedings against the Jeffris Lumber Company, which had been adjudged a bankrupt by that court.. ,
 

 “The evidence further shows that nothing more than as above stated has been paid on the above loan, guaranteed as already stated, by either the Jeffris Lumber Company or the Concordia Land & Timber Company; that about the time the Jeffris Lumber Company made a surrender of its property in bankruptcy for the benefit of its creditors, and was adjudged a bankrupt, all of the property of the Concordia Land & Timber Company, including the said 43,000 acres of timberland, was seized and sold in foreclosure of the mortgage of the Continental & Commercial Trust & Savings Bank; that Roy H. Godard became the purchaser at the said foreclosure sale of the saw mill and all' of the timberlands, the timber on certain enumerated sections thereof being exempted from the sale.
 

 “It is not alleged, nor is it shown in the evidence, that the Concordia Land & Timber Company ever made a surrender in bankruptcy for the benefit of its creditors, or was ever adjudged' a bankrupt.
 

 “The evidence further shows that plrior to the said foreclosure proceedings, Rathborne, Hair & Ridgway Company had partly built on the lands of the Concordia Land & Timber Company, a veneer plant and box factory, which was also exempted from the foreclosure sale; that about the time of the foreclosure sale, or shortly thereafter, the Black River Lumber Company, the garnishee, and defendant in the consolidated cases, was incorporated and organized; that Rathborne, Hair & Ridgway Company sold to the Black River Company, who had. bought from Godard the lands and other property which he had acquired at the foreclosure sale, its veneer plant and box factory, and as a part of this transaction, by oral agreement, Rathborne, Hair & Ridgway Company sold and assigned, with full subrogation to the Black River Lumber Company, all of the
 
 *107
 
 rights which it had under the contract between itself and the Jeffris Lumber Company, together with all of the accessories of that contract, including the guaranty of the Concordia Land & Timber Company; and it is this guaranty which the Black River Lumber Company is now seeking to enforce by way of re-convention against the Concordia Land & Timber Company. We need not recite, or discuss, what was the consideration for the assignment of this claim by Rathborne, Hair & Ridgway Company to the Black River Lumber Company, or whether the consideration has been paid in whole or part, as no one is concerned as to that, save these two companies. The assignment has been fully recognized by Rathborne, Hair & Ridgway Company as is shown by the testimony of Mr. B. E. Masters, who is not only the president, but also a large stockholder and director in it.
 

 “Counsel for plaintiff, in these consolidated suits, advance some argument to the effect that, because the assignment of this claim to the Black River Lumber Company wa§ not notified either to the debtor or its surety, therefore it produced no effect as to either of the plaintiffs in these consolidated suits. That contention would be correct, if any one by seizure, or otherwise, had acquired or was asserting any right to this claim other than the Black River Lumber Company. There is nothing of the sort here. Since Rathborne, Hair & Ridgway Company recognize the Black River Lumber Company to be tlje owner of the claim, a payment to the latter company, could injure no one, and would operate a valid acquittance and discharge of the debt to either the debtor, or its surety. All that the debtor or its surety can claim is that the situation be such as to afford full protection against the possibility, which doesn’t exist in this case, of having to pay the debt twic’e. This legal principle is so elementary that the court deems it unnecessary to cite authorities in its support.
 

 “What did the Concordia Land & Timber Company guarantee; or what was the obligation for the discharge of which on the part of the Jeffris Lumber Company it stood surety for? '
 

 “To ascertain this, we must look into the contract between the Jeffris Lumber Company and Rathborne, Hair & Ridgway Company. We learn from that contract that the Jeffris Lumber Company had obligated itself to the Rathborne, Hair & Ridgway Company to cut and deliver to the latter company not less than two and one-half million feet of green logs per year, at $9.50 per thousand feet—the cutting and delivery to continue during the life of the contract until all of the then standing green gum timber on the lands described in the contract, estimated at between sixty-five and eighty million feet, should be cut and delivered. It was further stipulated in the contract that the $62,000 loaned and used as already stated should be refunded to Rathborne, Hair & Ridgway Company by a deduction of $3 per thousand feet from the price of $9.50 per thousand feet of the gum logs delivered, until the aggregate amount of these deductions should equal the sum of $62,000, with 3 per cent, per annum interest thereon. The amount of logs to be delivered, per year, and the deduction per thousand feet, would fix the amount to be paid each year until the whole debt, with interest, was paid, at $7,500. It would require making a yearly payment of that amount, more than eight years, counting from the date of the contract May 16, 1917, to pay and discharge the principal sum, to say nothing about interest.
 

 “Where a term is given to pay a debt, the debt is not matured until the last day of the term has expired. So then, under the contract, the Jeffris Lumber Company could not have been put in default for the yearly delivery of two and one-half million feet of gum logs until the last day of the year had expired. This would make each yearly payment of $7,500 mature by lapse of time on May 16th of each year, beginning in 1918. We see from this lapse of time that only six payments of $7,500 each, aggregating $45,000, have matured. There are, therefore, more than two payments of $17,000 of the $62,000, to say nothing of interest, still unmatured by lapse of time. Subtracting the amount paid in 1918, $18,567.48, from the amount $45,000, now matured by lapse of time would leave of the principal sum $26,432.52, now due and unpaid.
 

 “The adjudication and surrender in bankruptcy of the Jeffris Lumber Company did not have the effect in so far as the Concordia Land & Timber Company, the surety, is concerned, of maturing at the institution of this suit, or even now, the entire amount of the principal of this debt. The debt, as to the surety, can only be matured by the lapse of the term fixed in the contract. C. C. 2054; Millaudon v. Toucher, 8 La. 582; Harrod v. Burges, 5 R. 449; Denegre v. Milne, 10 A. 324; Seixas v. Bank, 38 A. 443; Taylor v. Drane, 13 A. 64; Blanchard v. Grousset, 1 A. 96; National Bank v. N. O. Brewing Ass’n, 49 A. 934 (22 So. 48).”
 

 
 *109
 
 For these reasons, we are of the opinion that the judgment appealed from is correct, and it is therefore affirmed, at appellant’s cost.
 

 O’NIELL, C. J., is of the opinion that the prescription of one year was interrupted by the garnishment proceeding taken out by the National Park Bank.