127 So.2d 253 (1961)
SUTHERLIN SALES CO., Inc.
v.
UNITED MOST WORSHIPFUL ST. JOHN'S GRAND LODGE OF ANCIENT FREE AND ACCEPTED MASONS.
Nos. 57, 64.
Court of Appeal of Louisiana, Fourth Circuit.
February 20, 1961.
Rehearing Denied March 13, 1961.
Certiorari Denied April 25, 1961.
*254 Baldwin, Haspel & Molony, Robert R. Rainold, New Orleans, for plaintiff and appellant.
Racivitch, Johnson, Wegmann & Mouledoux, William J. Wegmann, New Orleans, for defendant and appellant.
Mammett & Bertel, H. L. Hammett, New Orleans, for third party defendant and appellee.
Before McBRIDE, REGAN and SAMUEL, JJ.
REGAN, Judge.
Plaintiff, Sutherlin Sales Company, Inc., a novelty advertising concern, instituted this suit against the defendant, its lessor, United Most Worshipful St. John's Grand Lodge of Ancient Free & Accepted Masons, endeavoring to recover $11,713.09,[1] representing property damage and its business loss resulting therefrom, caused when plaintiff's premises were flooded after defendant's agents or members negligently opened and failed to close water faucets, which were located above plaintiff's establishment. In the alternative, plaintiff pleaded the doctrine of res ipsa loquitur.[2]
Defendant answered and denied negligence, asserting that a provision in its lease[3] relieved it from liability in the absence of "positive neglect". In the alternative, defendant pleaded plaintiff was contributorily negligent in failing to properly store the damaged items and to minimize the damage after the flooding occurred. Further in the alternative, defendant asserted that the award to plaintiff, if any should be limited to actual physical damage.
Defendant then instituted a third party action against Lumbermens Mutual Casualty Company, its insurer, asserting it was liable to the third party plaintiff for $5,000, plus attorneys fees and costs, in the event defendant was cast in judgment, in conformity with the provisions of a policy of insurance between third party plaintiff and third party defendant.
Third party defendant initially adopted defendant's original answer as its own, but subsequently answered the third party petition and denied that its policy protected the defendant against water damage from flooding.
From a judgment in favor of plaintiff for $4,521, and dismissing the third party action, the defendant has appealed. Plaintiff also appealed requesting that its judgment be increased to $6,713.09, the actual amount of its physical damages, together with labor costs that it incurred.
The facts relative to the water flooding are relatively undisputed. The record reveals that on May 23, 1957, plaintiff was the lessee of ground level office space in defendant's four story building, located at the corner of Bienville and N. Peters Street in the City of New Orleans. Defendant also leased space to four other tenants therein; one operated a restaurant on the street *255 floor, another occupied offices on the second floor, and two tenants rented office space on the third floor. The remaining space in this building, i. e., the entire fourth floor, part of the third floor, and almost all of the second floor, was used by the defendant.
At approximately 8 p. m. on May 23, 1957, an agent of the Sewerage & Water Board informed defendant's elevator operator, Ada Dabon, that it planned to cut off the water in that building for several hours in order to repair a nearby hydrant. Apparently several faucets were inadvertently opened throughout the building after the water was turned off and thereafter were never closed. When all of the occupants vacated the building at 11 p. m. that night, the water was off and was not turned on again until 3 a. m. of May 24th.
As a result of the open faucets, water overflowed from a kitchen sink on the fourth floor and from plumbing fixtures on the second floor. The fourth floor sink's overflow occurred when a dish, left therein by an unknown person, obstructed the drain when the water was turned on again. The overflow from the second floor plumbing fixtures was not explained.
By 7 a. m., or four hours after the water was turned on, it had saturated a large part of the building on all floors, and in plaintiff's premises, several sections of the beaverboard ceiling had been pushed out by the cascading water falling from the upper portion of the building. Most of its premises was inundated, and as a result thereof, furniture was caused to float about the room and plaintiff's stock, stored on shelves and in corrugated boxes stacked on the floor, was thoroughly soaked and disheveled by the deluge of water.
The foregoing condition was discovered at 7 a. m. and an investigation disclosed that the water emanated from the fourth and second floors. There was also an open faucet over a basin on the third floor; however, it did not, for some unexplained reason, overflow.
The record also establishes that on the night before the flooding, the second and fourth floors had been used exclusively by members and agents of defendant's lodge.
Plaintiff has asserted a claim for several items of damage which, in substance, fall into three categories, i. e., (1) metal cuts used in printing valued at $1,410.20, (2) novelty samples destroyed valued at $5,190.89, and (3) labor expenses. It will be observed at this point that plaintiff neither introduced evidence to establish damages resulting from loss of business nor has he urged a claim therefor in this court.
The evidence and testimony inscribed in the record relative to the damaged metal cuts is as follows:
Frank G. Perschall, vice president and sales manager for the plaintiff, testified that the damage to the cuts, which were stored in a wooden cabinet when the flooding occurred, was not discovered until several days thereafter, because plaintiff's agents were initially preoccupied with what was the most obvious disorder of the premises. Upon checking the cabinet in which the cuts were stored, Perschall said he learned they all had been ruined due to water etching and pitting the plates and to the warping of wooden blocks affixed to the back thereof. He then made a complete inventory of the damaged cuts and submitted the list to Robert E. Darrah, manager of Crescent City Engraving Company, so that the photo engraver could estimate the replacement cost thereof. The art work, Perschall explained, would cost $674, while the cuts themselves would cost $736.20, or a total of $1,410.20 to have them reproduced.
Darrah, who has been in the photo engraving business for 25 years, appeared on plaintiff's behalf and explained that he had examined a large portion of the cuts and had determined they were ruined because the water etching made them unprintable. He asserted it was less expensive to replace the cuts than to repair them, estimating the *256 cost of repair to each at $6 per plate. He emphasized that in undertaking the repair he would be unable to guarantee the result.
In rebuttal, Clifford Bernard, superintendent of the New Orleans Engraving Company, appeared on defendant's behalf and expressed the opinion that between 25 and 30% of the cuts could be repaired for a sum of less than 20% of the original cost. He further said the cuts could be repaired to his satisfaction, but later vacillated and testified that the customer might find a flaw in the repair work; because of his laborious equivocation, his testimony is very unconvincing. Bernard also said all the metal plates could have been salvaged had they been given immediate attention after being water-soaked, but he said action to salvage had to be taken within two or three hours after the damage occurred. It will be recalled that the faucets were turned on at 3 a. m. and the deluge of water was not discovered until 7 a. m.
It is necessary to preface a discussion of the testimony relative to the damage of the sample merchandise with a brief explanation of the nature of plaintiff's business. It sells large quantities of novelties to business concerns, who promote and advertise their businesses by distributing gifts to various customers, on which is imprinted the name of the firm so advertising. The novelty items are manufactured from metal, leather or paper; thus they range from lead pencils and paper calendars to clocks and leather briefcases. Plaintiff is required to stock approximately 5,000 items, which it uses as samples. When a sale is consummated, plaintiff then orders large quantities from the manufacturer which produces the novelty, rather than stocking large quantities of each item. A sample displayed to a customer must be in perfect condition for obvious reasons.
Frank Perschall testified that upon his arrival at his place of business on the morning after the flood he discovered that the samples were absolutely ruined. The corrugated boxes in which they had been stored were washed all about the floor and, of course, watersoaked. As a result the leather goods were streaked and spotted, the metal objects rusted and discolored and the paper ruined. He and Raymond Kirkwood, plaintiff's president, worked from 9 a. m. to 6 p. m. both May 24th and May 25th in an effort to salvage the sample stock but finally gave up the task as fruitless. A quantity of the damaged goods were discarded; the balance was stored on the third floor of the building.
Kirkwood verified Perschall's statements relative to the condition of the samples and their hopeless endeavor to minimize the loss. He prepared a list which revealed that the total damage to samples was $5,190.89 and then explained the accounting process used to arrive at this conclusion. All samples purchased are treated as assets with a life expectancy of two years, and over this period they are depreciated on the company's books until they have been reduced to no value. He was emphatic in pointing out that the life expectancy and depreciation are treated in this manner only for tax purposes; therefore, while the company's books indicate the items are valueless at the end of two years, in reality they are not rendered worthless. In fact, many samples may be used over and over for many years after they disappear from the books as assets.
In itemizing the damages, Kirkwood first noted the figure of $1,359.43, representing the depreciated value of stock on hand as of April 30, 1955. Next he listed month by month the actual cost expended by plaintiff in purchasing samples between the period beginning May 1955 and ending May 1957. The amounts totaled $5,190.89.
Harrie W. Pearson, and advertising novelty jobber who incidentally is a competitor of the plaintiff, testified that he had inspected the water-damaged samples that had been stored on the third floor. He estimated 80% of the items were worthless, but declined to place a monetary value thereon because he had not taken an inventory. He further stated the life of a sample ranged from one to five years.
*257 In rebuttal, A. R. Turner, grand master of the lodge, and Henderson Lewis, executive secretary, both laboriously testified that they had inspected the samples after storage and asserted that only a small fraction thereof had been damaged. Neither witness estimated the percentage of damaged goods, nor was either one familiar with the operation of a novelty advertising concern.
Oliver A. Harris, a salesman in the advertising and specialty business since 1938, was qualified as an expert in this field by the defendant for the purpose of evaluating damage. He examined the merchandise in question item by item, after which he concluded the total damage found was $200 or $300. In assigning a percentage to the proportion of damaged goods found, he stated that 20% was damaged and the balance was not. Harris said the life of a sample is one year. He explained many items became obsolete because the manufacturer would often change its design annually. He reluctantly conceded, however, that many items remained the same for several years and that these could be used from year to year, provided there was no change in the manufacturer's design.
To establish the expenditure of $12 for labor to restore the order of plaintiff's premises the day after the flood, Frank Perschall testified that several laborers were hired and paid that amount. This evidence was unrebutted.
Relative to the question of negligence, the trial judge, after hearing the testimony, invoked the doctrine of res ipsa loquitur and concluded that the defendant had failed to prove freedom from fault. In his written reasons for judgment, he also expressed the opinion that plaintiff had established the negligence of the defendant or one of its agents by a preponderance of the evidence.
Counsel for plaintiff asserts that the trial judge was correct in finding it had proven negligence and alternatively insists that had negligence not been established, the doctrine of res ipsa loquitur is applicable to these facts and the burden of proof thus shifts to defendant.
Defendant however argues error lies in the application of the doctrine of res ipsa loquitur, since plaintiff failed to prove defendant had exclusive control of the plumbing facilities. Alternatively, it argues that if its agents or members left the faucets open, these acts per se do not constitute negligence.
In view of the relatively undisputed facts, we find it unnecessary to discuss the applicability of the doctrine of res ipsa loquitur, which was plaintiff's alternative endeavor to place the burden of proving absence of fault upon the defendant. The record leaves no doubt that defendant's agents or members exclusively occupied the second and fourth floors the night before the flooding. There is also no doubt that defendant's elevator operator was notified that the water would be turned off by the Sewerage & Water Board. If, knowing this, she failed to inform the building occupants or check the faucets when she left the premises on May 23rd at 11 p. m., these acts would constitute negligence which could be imputed to her employer, the defendant. Conversely, had she informed the defendant's members or agents, and knowing this they left the faucets open, their acts would likewise constitute negligence. At this point we reiterate that the source from which the flooding emanated was under the exclusive control of defendant's agents or members. We are, therefore, convinced that the plaintiff proved fault on the part of defendant with that certainty required by law. A civil case need not be proved beyond a reasonable doubt. The civil law concerns itself with "reasonable probabilities" rather than absolute certainty.
Turning our attention to the question of quantum, plaintiff asserts the trial judge erred in computing damages; therefore, it insists that we increase the amount of the *258 judgment in conformity with the following itemization thereof:

Samples $ 5,190.89
Metal Printing Plates
(cuts) 1,410.20
Furniture & fixtures 100.00
Labor to clean up debris 12.00
 __________
 $ 6,713.09

Plaintiff asserts it has proven the above damages, thus it is entitled to the entire amount.
Defendant, on the other hand, insists that the plaintiff failed to establish with certainty the amount of damages to which it claims to be entitled, despite the fact that such damages were susceptible of proof.
Clarity requires our treating each item separately.
(1) Furniture and fixturesThe record reveals no evidence whatsoever that the furniture and fixtures were damaged or to what extent they were damaged. Plaintiff introduced into evidence photographs reflecting the condition of his premises after the flooding, and from these it asks the court to draw an inference that at least $100 of damages was caused to the furniture and fixtures. It is too well settled to require citation in support thereof that a nebulous allegation unsupported by proof is far too speculative to form the basis for a money judgment.
(2) LaborFrank Perschall testified that $12 was expended for labor in restoring the order of plaintiff's offices. This was uncontradicted. The weight of authority preponderates to the effect that an uncontradicted statement as to expense incurred is sufficient evidence to establish it as an item of damage[4]; therefore, the trial judge erred in failing to include this amount in his judgment.
(3) Metal cutsThe trial judge awarded plaintiff the sum of $940 for the damaged plates, based upon the premise that they had depreciated to the extent of one-third of their original value through usage. He accepted the plaintiff's inventory and his engraver's estimated replacement cost; on the other hand, he discarded the testimony of defendant's expert to the effect that 25 to 30% of the cuts could be salvaged at a minimum expense. Apparently his reason therefor was predicated on the fact that the engraver stated the repair work would not be guaranteed. There is also testimony in the record to the effect that cuts may be used over and over again. Despite this, and without any evidence that the actual value of the plates depreciated with usage, the trial court allowed a one-third depreciation. This, we believe, was error; therefore, the judgment relative to the award for metal cuts should be amended and increased to $1,410.20, the amount of loss proved by plaintiff.
(4) SamplesThe lower court awarded plaintiff the sum of $3,581.10, which represents 69% of plaintiff's claim for damaged samples.
The court, "* * * using the discretion vested in it by the jurisprudence, * * *", applied the following formula:

 "Samples
 --------
Damages: Kirkwood and Perschall 100%
 Harris 20%
 Pearson 80%
 _________
 3/ 200%
 _________
 66.66%
Life of samples Kirkwood and Perschall,
 2 years 100%
 Harris, 1 year 50%
 Pearson, 1 to 2 years 66%
 _________
 3 / 216%
 _________
 72%
 Average Damage 66%
 Average Life 72%
 _________
 2 / 138%
 __________
 69%

Thus, it is apparent that the trial court first averaged the estimated percentage of damages given by three witnesses and divided that figure by three. He next averaged the estimates of a sample's life expectancy, using as his base a two year period, and *259 again divided the percentage by three. He then added the average percentage assigned to the quantity damaged to the average life expectancy estimate percentage, divided by two, and fixed the value of the samples at 69% of the amount claimed.
It is a well settled principle of law that as a general rule a plaintiff must specifically prove each item of damage in order to recover. However, an exception thereto has been recognized in instances where there is obvious damage, but the quantum is not susceptible of the most accurate proof. Under these circumstances, the trial court must use its own discretion in assessing damages, predicated on the testimony and evidence adduced.[5]
However, it is also a cardinal rule of evidence that plaintiff must produce the best evidence available to prove his claim.[6]
In view of what we have said hereinabove, it is therefore necessary for us to determine whether plaintiff proved damages to the samples with the most reasonable evidence available and also whether the trial judge, under these highly individualized facts, was justified in exercising his discretion in formulating a method of arriving at the quantum which he would award to plaintiff.
Plaintiff's business required it to stock approximately 5,000 items, and they ranged in price from one cent to $12. They were used for sample purposes only and therefore not duplicated in large quantities. When the flooded condition of the premises was discovered, plaintiff's employees and several laborers worked for two days attempting to salvage whatever they could. Simultaneously firemen were engaged in pumping water from the building. The samples which were stored on shelves and in boxes were thoroughly inundated; this fact was substantiated by photographic evidence as well as testimony. In the course of restoring the business to some semblance of its former order, an unknown percentage of the damaged items was discarded. The balance was stored on the third floor. Under these very unusual circumstances, we do not think that the damages could be determined with that certainty or accuracy that the defendant insists upon in this court.
The civil law offers a broad latitude to the trial judge for the individualization of each case in order to reach a just conclusion. The lower court obviously followed this technique in computing the amount of the obvious damages incurred by the plaintiff.
Therefore, we conclude the trial judge was justified in exercising his discretion in evaluating the quantum awarded to the plaintiff.
The final question posed for our consideration is whether the trial court properly dismissed plaintiff's third party petition against its insurer. The insurer relies upon its policy as a defense hereto, particularly the provision which appears under exclusions to coverage:
"(j) under coverage B (property damage provision) to any of the following insofar as any of them occur on or from premises owned by or rented to the named insured and injure or destroy buildings or property therein and are not due to fire:
"(1) the discharge, leakage or overflow of water or steam from plumbing * * *
*260 We are of the opinion that the contract of insurance existing between the third party litigants clearly excluded coverage for damage caused by an "overflow of water from plumbing", which was undisputedly the cause of the damage plaintiff incurred; therefore the trial judge properly dismissed the third party action instituted in these proceedings.
For the reasons assigned, it is ordered that the judgment of the trial court be increased from the sum of $4,521 to $5,003.20 and as thus amended, the judgment in all other respects is affirmed.
Amended and affirmed.
NOTES
[1] This figure represents the following items: (a) damage to stock and equipment$6,701.09; (b) cost of labor hired to restore premises to order$12; and (c) loss of business$5,000.
[2] Which would, if invoked as a rule of evidence, place the burden of proving absence of fault upon the defendant.
[3] "Lessee assumes responsibility for the condition of the premises and lessor will not be responsible for damage caused by leaks in the roof, by bursting of pipes by freezing or otherwise, or by any vices or defects of the leased property, or the consequence thereof, except in cases of positive neglect. * * *."
[4] Bergeron v. Roberson, 1954, 224 La. 932, 71 So.2d 332.
[5] Germann v. 557 Tire Co., 1928, 167 La. 578, 120 So. 13. See also 17 T.L.R. 662, which in part reads: "* * * Where in certain cases there is obviously some damage, though it is not susceptible of specific determination, the quantum of such damages must be determined as best it can. * * * In its performance of that duty the court has much discretion. * * *"
[6] Breaux v. Laird, 1956, 230 La. 221, 88 So.2d 33; Murff v. Murff, La.App. 1941, 1 So.2d 407; Moore v. Natchitoches Coca-Cola Bottling Co., La.App., 32 So.2d 347.