**VOLKSWAGEN OF AMERICA, INC.,**
**Plaintiffs-Appellees,**

v.

**Willard E. ROBERTSON, etc., et al.,**
**Defendants-Appellants.**

**No. 81–3472.**

United States Court of Appeals,
Fifth Circuit.

Sept. 9, 1983.

Rehearing Denied Nov. 8, 1983.

Deutsch, Kerrigan & Stiles, Malcolm W. Monroe, Howard J. Ettinger, New Orleans, La., for defendants-appellants.

Roger M. Denton, Metairie, La., for plaintiffs-appellees.

Before GARZA, REAVLEY and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This is an appeal from a Louisiana diversity judgment rendered against appellant Willard E. Robertson ("Robertson") and his wholly owned Louisiana corporation, appellant Willard E. Robertson Corporation, for flood and sewage damage caused to 368 cars owned by appellee Volkswagen of America, Inc. ("Volkswagen"), a New Jersey corporation, while the cars were stored at Higgins Terminal Yard ("Higgins" or the "yard"), a 45-acre tract of land owned individually by Robertson, and in the custody and control of Compact Car Carriers ("CCC"), a division of Willard E. Robertson Corporation. The principal issues on appeal are (1) whether the district court erred in rendering an interlocutory summary judgment against Robertson holding him liable for the damage to the cars based upon his status as the owner-lessor of Higgins; (2) whether the district court erred in holding, after a nonjury trial, that CCC was liable for the damage as a compensated depositary; and (3) whether the district court erred in assessing against Robertson and his corporation the entire amount of damages caused to the cars as a consequence of the flood.

Although the district court correctly held that Robertson and his corporation were jointly liable for the flood and sewage damage, we hold that the basis for the damages award is unclear, and that certain parts of the award are unsupported by sufficient evidence. The district court's judgment is therefore reversed and remanded for a new trial on the damages issue only.

### I.

### FACTS

#### A. HIGGINS AND THE LEVEE

On July 22, 1964, Robertson purchased Higgins from Higgins Industries, Inc. for $1,400,000. This property is located in New Orleans, Louisiana. The east boundary of Higgins adjoins the west bank of Michoud Canal. A hurricane protection levee protects Higgins from this canal. The Michoud Assembly Facility of the National Aeronautics and Space Administration ("NASA") is located on the land immediately south of Higgins, and a sewage treatment plant owned by the Sewerage and Water Board of New Orleans (the "Sewerage Board") is located on the land immediately north of Higgins. The west boundary of Higgins adjoins the Gentilly Highway.

At the time Higgins was purchased by Robertson, he was, through his corporation, engaged in the business of importing and selling foreign cars. Beginning in 1965,

Robertson used Higgins as a site for storing part of his inventory of imported cars.[1]

In 1971, the Board of Levee Commissioners of the Orleans Levee District (the "Levee Board"), which maintains the hurricane protection levees in the New Orleans area, including the one adjoining Higgins, decided to have the levees and floodwalls in the eastern New Orleans area improved. As part of this improvement program, a new levee for the Michoud Canal was constructed during 1971 by the Army Corps of Engineers. This new levee was forty feet farther inland than the old one and was also higher.[2]

Before the new levee was built, two gravity-flow, flap-gate culverts had drained the rainwater from Higgins into the Michoud Canal. According to Robertson, these culverts had worked well, and Higgins had never flooded in spite of two hurricanes. The Levee Board, however, did not plan to have these culverts put back into the new levee, since Robertson's representatives had previously told the Levee Board that Robertson planned to install drainage pumps to drain Higgins. Although it is unclear from the record, it appears that while the new levee was being constructed, Higgins was flooded during Hurricane Edith, which occurred in the late summer of 1971. On September 29, 1971, Robertson wrote a letter to Mr. John P. McNamara of the Levee Board which stated, in part, as follows:

"You referred to a meeting some time ago which included Mr. Blackwell in which the possibility of locating a pumping station was discussed. This pumping station is part of a long range plan which depends upon full utilization of the entire tract. Full utilization of this land cannot be realized until certain other projects in the vicinity are completed, for example, the dredging of the Michoud Canal, etc. During this interim period the gravity drainage of this property is satisfactory.

"In view of the above, it is requested that this gravity drainage system be reinstalled to avoid any further damage."

On October 7, 1971, Mr. McNamara responded, as follows, to Robertson's letter:

"I acknowledge receipt of your letter of September 29, 1971 in regard to the flooding of your property on the West Bank of the Michoud Canal resulting from the heavy rain which accompanied Hurricane Edith.

"During the past years your Mr. L.G. Blackwell had indicated in various meetings with our Mr. Willoz and members of the Corps of Engineers' staff that your firm was planning to install a pumping station on your property to handle the run off water from rains. It was the consensus of opinion of the people who met with Mr. Blackwell that the pumping station was to be built in the not too distant future from the date of the January 17, 1969 meeting and not as part of a long range project.

"Based on this assumption the contract for the new levee and floodwall called for the removal of the culverts.

"On November 23, 1970 we furnished you copies of Plan File No. H–4–25160, Drawings 1 thru 19 which are the construction drawings for this work. The removal of the culverts are shown on Drawings 6 and 7. We asked you at this time to review these plans and forward us your comments. Since we did not receive any objections from you we assumed that the proposed work met with your approval and the drainage would be handled by your pumping station.

"However, since we are now advised that your pumping station is part of a long range project we will make a study to determine the best method of draining the area.

"*I would like to point out at this time that gravity flow thru culverts with flap gates only provide drainage when the tide in Michoud Canal is lower than the level of the water in the area being drained.*

---

1. In his deposition, Robertson testified that before September 1974, about 100 or 200 cars would be stored at Higgins at any given time.

2. We have found no indication in the record as to the height either of the new levee or of the old one.

*"If during a hurricane we experience a high tide and a heavy rainfall, the area behind the levee will be subject to flooding from rain water if gravity flow culverts are utilized for draining the area.*

*"We will attempt to remedy the present situation as soon as possible."* (Emphasis added.)

Flap-gate culverts, similar to those which previously provided drainage at Higgins, were subsequently reinstalled. Each culvert consists of a 42-inch corrugated metal pipe with two gates or protective flaps. One of the flaps automatically closes when the tide in the canal reaches the level which would otherwise cause water from the canal to flow back through the culvert onto the protected side of the levee. The second flap is a "positive protective gate" that is manually operated, and which is required to be installed by the regulations of the Department of the Army, Office of the Chief of Engineers.

It was the standard operating procedure of the Levee Board to manually close the positive protective gates in its system of levees whenever the City of New Orleans was threatened by a hurricane and high tides were expected.[3] In a pretrial discovery deposition, Robertson testified that he knew that if there were a threatened hurricane, the positive protective gates would be closed, because otherwise it would be anticipated that the water in the canal might rise, flow back through the culverts, and flood the protected property.

## B. HIGGINS AND VOLKSWAGEN

On June 4, 1974, Robertson leased Higgins to Volkswagen to be used as a storage site for cars imported into the United States before they were sent on for distribution to dealers. Article 4.1 of the Robertson-Volkswagen lease agreement provided as follows:

"Tenant will, at Tenant's own expense, maintain, protect and preserve the Premises in good, clean, well-painted order and condition and make all repairs to the Premises, as and when needed, including, for example, all structural repairs. All repairs will be equal in quality to the original work and will be completed in a workmanlike manner."

On the same day, CCC entered into a car hauling agreement with Volkswagen, whereby CCC undertook to transport and deliver Volkswagen, Porsche, and Audi cars imported through the Port of New Orleans and sold to franchise dealers throughout Louisiana, Alabama, Mississippi, and Western Tennessee. As part of this agreement, CCC also agreed to perform the following additional services for Volkswagen:

"(a) Receipting for and verifying vehicles imported by VWoA through the said port.

"(b) Transporting vehicles to the storage area known as the 'Higgins Property' for storage.

"(c) Storing vehicles.

"(d) Inspecting vehicles for marine damage.

"(e) Preparing marine damage reports and claims.

"(f) Baying and loading vehicles for delivery."

Although Higgins was leased to Volkswagen, Robertson's corporation was in control of the site.[4] As cars were delivered to Higgins, the employees of CCC would de-

---

**3.** This was done because the automatic gates were susceptible to wave action in the canal which could have created a suction effect and thus reopened the gates allowing water to flow back through the culvert onto the protected property.

**4.** Article 5.2 of the lease agreement provided:
"It is contemplated that during the Term of this Lease, Landlord or its designee, Compact Cars Division of The Willard E. Robertson Corporation will desire to use a portion of the Premises for the storage of tractors, trailers and other equipment used or to be used in the haulage of vehicles pursuant to an agreement with the Tenant executed simultaneously herewith. Landlord will also desire to use the structure or structures on the Premises for the conduct of its other activities. Landlord is hereby granted a license to enter upon the Premises and to use same for said purposes provided that payment therefor is made to the Tenant in monthly installments at the commencement of each month for such space at the rate of fifty cents per square foot per annum for such space as may be used."

termine where to park them on the yard. By September 6, 1974, about 4,200 cars— Volkswagens, Porsches, and Audis—were stored at Higgins.[5]

## C. THE HURRICANE

During the weekend of September 6–8, 1974, the New Orleans area was threatened by Hurricane Carmen. On Friday night, September 6, a Robertson employee, Joseph R. Boyd, was notified that a sewer line underneath Higgins had broken in two places and was leaking sewage into the yard.[6] Boyd went to Higgins to inspect the leaks. Boyd then called a plumber and the Sewerage Board. Because of the increasing rain that night and the next day, however, the broken line could not be repaired until after the hurricane.[7] Boyd and others present at the scene, however, testified that the amount of sewage coming out of the line was not large enough to flood the yard.

On Saturday morning, September 7, 1974, Boyd returned to Higgins. As he arrived at the yard, he met two men from the Leveé Board who told him that because of the impending hurricane "we had to close the flood gates to keep the Michoud Canal out." Boyd, another Robertson employee, Jack Hendricks, who was the manager of the Higgins yard, and a crew worked most of the morning closing open windows in the cars and moving them out of low-lying areas in the yard. No cars, however, were removed from Higgins. The weather worsened, and the crew quit working around 12:00 p.m.

With the rain continuing to fall, rainwater accumulated along the "toe of the levee" and rose to a level high enough sometime during Saturday, September 7, and/or early Sunday, September 8, to cause flood damage to 368 cars parked in or near that area. Since the topography of the yard sloped toward the toe of the levee, the rainwater, while heading in that direction, mixed with the sewage coming out of the broken line to further damage the cars. Volkswagen made several inspections of the damaged cars, after which they were classified according to the height of the water in each car.[8] The cars were eventually divid-

Robertson's corporation maintained an office at Higgins and provided a security guard for the yard.

**5.** In his deposition, Robertson testified that he did not "think we ever had quite as many" cars on Higgins at one time. He added that "[a]t the time sales were slow and they unloaded cars, and in general were dumping them off. We were loaded with cars." During this period, the normal amount of cars stored at Higgins was about 1,000.

**6.** There were two sanitary sewer lines that ran underneath Higgins, a twelve-inch sewer force main or "main" line and a four-inch line which was connected to the twelve-inch line. The twelve-inch line was owned and maintained by the Sewerage Board, and connected the NASA facility, located on one side of Higgins, with the Sewerage Board's treatment plant, which was located on the opposite side of Higgins. NASA pumps sewage under pressure through this line. It is undisputed that only the four-inch line ruptured. The rupture occurred in the area between the main warehouse at Higgins and the levee nearby a dirt road leading from the warehouse toward the toe of the levee—the area where most of the damaged cars were parked. Sewage also was overflowing from a sump tank in a small office building used by CCC and Robertson. This office area was sealed off with sandbags.

There is also a six-inch water main that runs underneath Higgins. Although the record indicates that this main was repaired, there is no evidence that it caused the flooding at Higgins.

**7.** Volkswagen was billed for the repair of the broken line by the entities which performed the repair services.

**8.** The record shows that there were at least three inspections made of the damaged cars. The first inspection arose out of a routine quality inspection, and took place shortly after the hurricane, during which the damaged cars were separated out and placed in an area of the yard by themselves. The cars were then inspected again and divided into three categories, repairable, questionable as to repairable, and total loss. On September 26, 1974, 27 cars were considered total losses, 93 were considered questionable total losses, and 235 were considered repairable. Then in early October 1974, another inspection was made by Volkswagen engineers and technicians, and Volkswagen's insurer. After this inspection, 289 Volkswagens were deemed repairable and were returned to West Germany for repairs. The remaining cars, 76 Volkswagens and three Audis, were declared total losses. The 76 Volkswagens were sold for salvage to four dealers located in New Orleans, Mobile, Alabama, West Nyack, New York, and Englewood Cliffs,

ed into two groups; those considered total losses, which were sold for salvage, and those considered repairable, which were sent back to West Germany for repair at various Volkswagen repair shops and then sold to Volkswagen employees or used as company cars.[9] Volkswagen's insurer, appellee Frankfurter Versicherungs Aktiengesellschaft ("Frankfurter"), a German corporation, paid Volkswagen $642,631.60 for the losses and expenses sustained as a consequence of the flooding.

## D. THE LITIGATION

On August 28, 1975, Volkswagen, and Frankfurter as subrogee, brought suit against Robertson, his corporation, the Sewerage Board, which owned the main sewage line underneath Higgins, NASA, whose nearby facility used the main sewage line, and Mason-Rust, Inc. ("Mason-Rust"), which maintained the NASA facility.[10] On January 29, 1976, the Levee Board was also made a defendant.

On December 30, 1976, however, the district court granted the Levee Board's motion for summary judgment against Volkswagen and Frankfurter. The district court held that the affidavits and depositions in the record indicated "beyond genuine dis-

pute, that the Levee Board did not own either of [the two sewage lines underneath Higgins], and had no responsibility for the maintenance of either of them." As to the manual closing of the positive protective gates to the drainage culverts at Higgins, the district court held:

> "[T]here is no evidence that the hurricane waters would not have inundated the property absent closing of the flood gates. The evidence before the court indicates that, even if the flood gates had been left open, the property would have been flooded. Nor is there any evidence that the action of the Levee Board was unreasonable in the light of the impending threat to the city. Finally, there is no claim that notice and a chance to remedy the situation was given the Levee Board."

On May 2, 1977, NASA, Mason-Rust, and the Sewerage Board entered into a settlement agreement with the plaintiffs and were voluntarily dismissed from the lawsuit.[11]

On May 31, 1977, the district court granted Volkswagen and Frankfurter's motion for summary judgment against Robertson individually in his capacity as the owner-lessor of Higgins, on the ground that Robert-

New Jersey, respectively. The total received was $42,999 or $565.77 per car. It appears that the three Audis were returned to West Germany and were repaired.

9. Although the Special Master states that 289 cars were returned to West Germany, plaintiffs' answers to interrogatories indicate that 293 cars were returned; yet, plaintiffs introduced into evidence 296 repair invoices for the cars repaired at the Volkswagen repair shops in West Germany. Nowhere in the record are these discrepancies resolved. However, a report by Captain J. Wedekind states that "a total of 287 water damaged vehicles stored at the Higgins storage area . . . and 9 additional vehicles to be returned from dealers would be shipped to [West Germany] to be reconditioned by repairs." In a later report, Wedekind states that 294 cars, of which only 292 were sewage damaged, were returned to West Germany.

10. The City of New Orleans, the Board of Commissioners for the Port of New Orleans, and two employees of Robertson's corporation, Joseph R. Boyd and Jack H. Kendricks in both their individual capacities and their capacities

as officers of Robertson's corporation, were also made defendants, as were their insurers and the insurers for the other defendants. Both the City of New Orleans and the Board of Commissioners for the Port of New Orleans were later granted summary judgments and dismissed from the suit. The claims against Boyd and Kendricks remained pending until the conclusion of the trial of CCC's liability, when the claims were dismissed against them individually. *See* note 12, *infra.*

11. NASA, Mason-Rust, Mason-Rust's insurers, and the Sewerage Board each agreed to pay the plaintiffs $833.33 "in full and complete compromise" of the cause of action against them. Previously, on February 11, 1977, the district court had rendered a partial summary judgment for NASA, the Sewerage Board, and their insurers holding them not liable to plaintiffs for water damage to the cars. The court added in its judgment, however, that "[t]his partial dismissal does not dismiss any of plaintiffs' claim as against those parties concerning any claim for contamination or damage caused by sewage materials." This claim, however, was taken care of by the settlement agreement.

son breached his obligations to Volkswagen under Louisiana law by leasing Higgins to be used as a storage area for cars when he knew that there was a reasonable possibility that Higgins would flood if the flap-gate culverts were closed during a hurricane. The court held:

> "The property had a defect, its potentiality for flooding under certain circumstances. The lessor knew of this and knew also that, if it occurred, it would damage the lessee's property. He neither warned of the peril nor took any steps to avert it. The lessee had no obligation to take measures to avoid the risk; therefore, the liability of the lessor is established . . . ."

On June 13, 1977, the liability of CCC to Volkswagen and Frankfurter for the damage was tried to the district court. After hearing the evidence thereon, the district court held that the cause of the damage was the absence of pumps at Higgins that would have removed the excess rainwater from the premises; that Robertson's knowledge of this defect at Higgins was attributable to his corporation; and that having such knowledge, it was negligent for CCC, a compensated depositary, to store the cars at Higgins with the defect therein unremedied.[12] The district court also held that Volkswagen was not contributorily negligent in failing to make any efforts to remove the cars from Higgins, since it was established that Volkswagen had no prior knowledge of the defect.[13]

## E. DAMAGES

Having resolved the liability issues against Robertson and his corporation, the

---

**12.** The district court rendered judgment against CCC only, and dismissed plaintiffs' claims against Robertson and his employees, Joseph R. Boyd and Jack H. Kendricks, individually. Robertson, of course, had already been held liable individually for the damage to the cars based upon his status as the owner-lessor of Higgins.

**13.** The district court further found that the breaks in the sewer lines were not the *cause of any flooding* and that the breach of any duty of maintenance by Volkswagen, if there was any, did not cause the flooding. Concerning the sewage damage the court stated:

district court, on October 17, 1977, referred the question of damages to a United States Magistrate, who acted as a Special Master. After conducting a hearing, the Special Master, on June 29, 1979, rendered his "Findings, Conclusions and Recommendation," wherein he found that 365 Volkswagens and three Audis had suffered damage; that damage to these cars was not uniform but depended upon the depth of the water at the various locations on Higgins where the cars were parked; that some cars were total losses and that some were repairable; that water was left standing in some of the cars at the time of the various inspections in the days and weeks following the flood; and that no effort was made to mitigate or minimize the continuing deteriorating effects of this over the two-month period of time that the investigations were taking place.

The Special Master further found that 76 of the 365 Volkswagens were constructive total losses; that the net loss attributable to those Volkswagens was $146,123.71; that the three Audis were constructive total losses; that the net loss attributable to these cars was $2,402.63; that of the 289 remaining Volkswagens, which were shipped back to West Germany to be reworked and repaired, the damage thereto could have been mitigated or minimized by Volkswagen by draining the water from them, by removing flooring, carpeting and mats from them, by airing them out, by removing and drying the car seats, and by draining and replacing the engine oil; that 235 of these 289 cars were damaged but repairable at a reasonable and proper cost of $400 per car, based on an inspection "immediately post hurri-

> "Now if, indeed, a claim is made for contamination by sewage, I will leave that to the trier of fact on assessment of damage to determine in the light of these observations and in the light of such further evidence, if any, as there may be on that subject. Certainly, I am not at this time trying in any way to assess the quantum of damage. For all I know at this time, it may have been minor or it may have been the full amount sued for. We have deferred the trial of that issue until we could reach the point where it's necessary."

cane" which found the repairable cost to be between $300 and $500 per car; that $94,000 would therefore be a reasonable and proper figure for the total cost of repairing these 235 Volkswagens; that the remaining 54 of the 289 Volkswagens were constructive total losses; and that the loss attributable to those 54 cars was $67,386.74. The Special Master also awarded Volkswagen additional costs in returning the 54 Volkswagens to West Germany.[14]

Based on these and other findings, the Special Master recommended that judgment be rendered for Volkswagen and Frankfurter for $350,858.68 against Robertson and his corporation, jointly and *in solido*.

On November 28, 1979, however, the district court recommitted the matter to the Special Master, because the court determined that the Special Master had failed to assess the loss in market value of the repairable cars and to consider the following costs pertaining to them: the necessary bodywork, replacement of panels, carpets, mats, sandproofing, and other body work necessitated by the flooding. The district court ordered the Special Master to consider these matters and to resubmit his report.

On reconsideration, the Special Master reviewed the transcript of the original proceeding before him and found that the 289 Volkswagens returned to West Germany suffered a loss of $1,644 each, which loss included the loss in market value, repair costs, and transportation and other incidental expenses.

This time, the district court accepted and adopted the Special Master's findings and recommendation, and on July 15, 1981, rendered final judgment for Volkswagen and Frankfurter against Robertson and CCC *in solido* in the amount of $647,631.66, which was about $1,300 more than the plaintiffs prayed for in their complaint, but the exact amount Frankfurter paid Volkswagen for the loss (plus the $5,000 "deductible" on Volkswagen's policy).

## II.

## LIABILITY

### A. ROBERTSON

■ Appellants contend that the district court erred in granting Volkswagen and Frankfurter ("the plaintiffs") a partial summary judgment holding Robertson liable for flood and sewage damages based on his status as the owner-lessor of Higgins. Their initial argument is that the district court erred in holding that "[t]he possibility that [Higgins] might be inundated by rain water was a defect, that is a shortcoming not to be expected in normal property." Based upon the undisputed summary judgment evidence, we disagree.

Article 2695, LSA–C.C., provides that:

"The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same."[15]

---

14. The Special Master, however, denied plaintiffs any recovery for transportation expenses incurred in returning the 235 Volkswagens to West Germany. *See* part III, *infra*.

15. Thus, under Louisiana law, "[t]he lessor warrants against all the vices and defects of the thing which may prevent its being used for the purposes of the lease"—or, in other words, "the thing leased must have no vices and defects which render it unfit for the purposes of the lease." *Bennett v. Southern Scrap Material Co.*, 121 La. 204, 46 So. 211, 212 (1908). This warranty or guarantee is written by law into every contract of lease, whether of movable or

immovable property, *Equilease Corp. v. Hill*, 290 So.2d 423, 425 (La.App. 4th Cir.1974), and, in the case of immovables, the "lessor's obligations extend beyond the building or space actually occupied by the tenant and encompass all features of the premises available to the lessee." *Pollard v. Roberts*, 306 So.2d 801, 804 (La.App. 2d Cir.1975). The lessor's negligence, and under article 2695 his knowledge, is immaterial since Louisiana law "imposes strict liability upon a lessor for damages occasioned to a lessee due to a defect in the leased premises." *Ward v. Conn*, 344 So.2d 60, 62 (La.App. 4th Cir.1977); *Pollard*, 306 So.2d at 804.

Where, however, as here, the lessee assumes responsibility for the condition of the leased premises, the owner is not liable "for injury caused by any defect therein to the lessee or to anyone on the premises who derives his right to be thereon from the lessee, *unless the owner knew or should have known of the defect or had received notice thereof and failed to remedy it within a reasonable time.*" LSA–R.S. 9:3221 (emphasis added).

Whether Robertson was liable to appellees under these Code provisions, raises three questions: (1) whether there was a vice or defect in the leased premises; if so, then (2) whether Robertson had notice of the defect and failed to remedy it; and (3) whether the defect proximately caused the damage to the cars.

■ Concerning the existence of a "vice or defect," the Louisiana Civil Code does not define these terms, but as the district court stated, "these words evidently refer to some shortcoming in the property that makes it less suitable than normal property." Louisiana courts, however, have held that not every defect in leased premises will serve as the basis for a claim of damages. *Templin v. Traders & General Insurance Company,* 288 So.2d 660, 663 (La.App. 3d Cir.1974); *Anslem v. Travelers Insurance Company,* 192 So.2d 599, 600 (La.App. 3d Cir.1966). Instead, "[t]he vices and defects contemplated in LSA–C.C. 2695 must be substantial and of such nature as are likely to cause injury to a reasonably prudent individual." *Morgan v. American Indemnity Company,* 180 So.2d 429, 433 (La.App. 1st Cir.1965).

Robertson argues, in effect, that the defect, if any, on Higgins was not substantial and therefore not within article 2695, since the same potentiality for flooding that existed on Higgins is shared by all property in southern Louisiana that is similarly situated.

The summary judgment evidence, however, shows that the section of Higgins that flooded was located at the toe of the levee, and was situated on top of an old log pond, which had been filled in by Robertson and

on which most of the damaged cars were parked. The evidence also shows that the rainfall which caused the flooding measured only about 4.56 inches and fell over a period of approximately twenty-four hours. More significant, however, is the knowledge that Robertson possessed respecting the lack of drainage on Higgins under certain conditions. In his deposition testimony, Robertson testified that he knew that if a hurricane approached the New Orleans area, the Levee Board would manually shut the positive protective gates on the two flap-gate culverts which provided the only drainage for Higgins:

"Q Then, if I understand it, they had the gate on the outside of them?

"A Yes, the outside of the levee.

"Q So if the water rose out in the Michoud Slip these gates would be closed to protect your property and keep it from being flooded?

"A That is correct.

"Q And you knew if there was a threatened hurricane those gates would be closed because it would be anticipated this water in the slip might rise and flood your property?

"A That is correct.

"Q Now, if there was no threatened danger of flooding, and water coming up in the Michoud Slip, and water was down below the gates of the drain, then, of course, those drains in the event of any rain hitting your property would drain that surface water off into the Michoud Slip, is that correct?

"A That is correct.

"Q Well, all of this as I understand it you knew before this incident occurred, is that right?

"A That is right.

"Q [D]id you install anything in this low area that you say you were aware of before this incident occurred as a sort of back-up type drain in the event it was necessary to shut these gates off so that the property couldn't drain into the Michoud Slip, did you install anything as an auxiliary or back-up type measure?

"A No, I did not." [16]

---

**16.** Although Robertson's testimony indicates that the outside gate was the positive protec-

The summary judgment evidence also shows that during the hurricane threat, high tides were predicted in the New Orleans area by the National Weather Service, and that the water level in the Michoud Canal, in fact, rose above the level of the culverts on Saturday, September 7, 1974, and remained above them at least all that day.[17] Thus, even if the Levee Board had not manually closed the positive protective gates on the culverts, the automatic gates would have remained closed. Based on this undisputed evidence, we hold that, as a matter of law, the lack of any drainage on Higgins during an impending or threatened hurricane was a "vice or defect" within the contemplation of LSA–C.C. 2695 and LSA–R.S. 9:3221.

We also hold that the summary judgment evidence conclusively shows that Robertson had knowledge of the defect and failed to remedy it *or* to disclose it to his lessee. Robertson denies that he had any such knowledge, based on the fact that Higgins had never flooded, even during several previous hurricanes, when the culverts had provided the only source of drainage. This argument, however, overlooks the fact that Robertson had been specifically warned by the Levee Board in 1971, after or while the new levee was being constructed, that Higgins would have no drainage during a hurricane, and that Higgins would thus be "subject to flooding from rain water if gravity flow culverts are utilized for draining the area."[18] Thus, although the culverts had always drained Higgins in the past, Robertson was given a specific warning, by an agency with expertise in drainage and flood matters, of the precise problem that occurred in September 1974: that the culvert drainage system was inadequate to handle such a problem.[19] Moreover, the fact that Robertson was planning to install a pumping station at Higgins to handle the rainwater runoff indicates that he or his staff were aware that the gravity drainage system was, by itself, insufficient to protect Higgins from flooding under certain foreseeable circumstances.

Robertson's next argument is that the defect did not cause the flood damage, but that the damage was caused instead by excessive rain associated with the hurricane, or in other words, an act of God. We note, however, that there is nothing in Robertson's pleadings, responses to plaintiffs' motion for summary judgment, or anything asserted by him at the hearing thereon, raising or dealing with the issue of an act

tive or manual gate, the summary judgment materials filed by the Levee Board in connection with its motion for summary judgment shows that it is the outside gate that closes automatically when the water level in the canal rises above the level of the culverts.

**17.** The record shows that one of the flap-gate culverts was approximately 1.3 feet below mean sea level, and that the other one was 1.6 feet below mean sea level. On Saturday, September 7, 1974, the water level in the canal reached a high of 6.68 feet above mean sea level and a low of 3.92 feet above mean sea level. There is no contention that the water level rose higher than the top of the levee.

**18.** There is, moreover, no evidence in the record which shows whether, during these previous hurricanes, the water level in the canal rose above the level of the drainage culverts. Here, however, it is undisputed that the water level in the canal, in fact, rose above the level of the culverts.

**19.** In footnote 10 of appellants' brief, they intimated that under LSA–R.S. 38:1235 the Levee Board, not Robertson, had the obligation to provide pumps or other backup drainage systems at Higgins if that were necessary for flood protection. Section 1235 provides, in part, as follows:

"The [Levee] board shall provide, by the best methods for the thorough protection of the district against overflow, and to this end the board *may* put up and erect in connection with its levee system, all pumps, flood gates and other appliances which may become necessary to carry out these purposes...." (Emphasis added.)

Although we have found no Louisiana decision concerning the Levee Board's duty to provide drainage systems, we understand section 1235 to mean that the Levee Board itself *may*, but has no absolute duty to, provide, at its own cost, *the necessary drainage systems to protect* property from flooding. Here, the correspondence between Robertson and the Levee Board shows that Robertson himself had agreed to install pumps at a future time. The record also shows that he had previously provided pumps for his property located at 4200 Michoud Boulevard, which was also leased to Volkswagen.

of God. We also note that the district court, in its order granting plaintiffs' motion for summary judgment, makes no mention of any assertion of an act of God as the cause of the flood damage. In fact, the arguments advanced in Robertson's response to the motion for summary judgment tend to negate any idea that an act of God caused the damage, and, instead, intimate that the flooding occurred because the Levee Board manually closed the positive protective gates to the culverts.[20]

In *Franz Chemical Corp. v. Philadelphia Quartz Company*, 594 F.2d 146, 150 (5th Cir.1979), this Court stated:

"It is almost axiomatic that any genuine issue of fact must somehow be shown to exist at the district court level. Where the moving papers do not reveal the presence of a factual controversy and the opposing party manifests silent assent through inaction, the opposing party will not thereafter on appeal be heard to belatedly assert as grounds for reversal that some factual disputes implicit in the underlying arguments have yet to be resolved."

*See also DeBardeleben v. Cummings*, 453 F.2d 320, 324 (5th Cir.1972) ("the adversary cannot simply assent by silence to the factual theory presented in the motion [for summary judgment]—and on which the parties stand in the Trial Court—and then assert thereafter on appeal as grounds for reversal a purported factual disagreement never before revealed"); *Frank C. Bailey Enterprises, Inc. v. Cargill, Incorporated*, 582 F.2d 333, 334 (5th Cir.1978) ("an appellate court,

in reviewing a summary judgment order, can only consider those matters presented to the district court").

Because the act of God argument was not presented by Robertson to the district court, we therefore refuse to consider it.[21] Moreover, the summary judgment evidence conclusively establishes that the *defective drainage* at Higgins caused the flood damage to the cars.

An affidavit of Enrique Medina, an employee of the Levee Board, shows that he and a Levee Board crew closed the positive protective gates to the culverts at Higgins on the morning of Saturday, September 7, 1974, between the hours of eight o'clock and nine o'clock, and that they returned and reopened them on Sunday morning, September 8, 1974, at approximately nine o'clock. And, as stated earlier, the water level in the Michoud Canal was high enough to have closed the automatic gates during most, if not all, of this time period. Joseph Boyd, a Robertson employee, testified in his deposition of May 17, 1976, that he went to Higgins on Sunday, September 8, 1974, and found that the area "behind the warehouse and particularly the area very close to the levee was covered with water." He further testified as follows:

"Q This area on Mr. Robertson's diagram where the circle has been marked with the words 'damaged cars', is that correct?

"A Right.

"Q Now, you said it was covered with water. What kind of water are we talk-

---

**20.** In several depositions, Robertson's employees, particularly Kendricks, testified that the level of the rainwater standing on Higgins was not very high. Kendricks testified that "at the very most" only five inches of water came from the rain and was standing in the toe of the levee.

**21.** We do note that in *Southern Air Transp. v. Gulf Airways, Inc.*, 215 La. 366, 40 So.2d 787, 791 (1949), the Louisiana Supreme Court described the act of God defense in the following terms:

"An act of God in the legal sense—that which will excuse the discharge of a duty and relieve a defendant from liability for injury—is a providential occurrence or extraordinary

manifestation of the forces of nature *which could not have been foreseen and the effect thereof avoided by the exercise of reasonable prudence, diligence and care or by the use of those means which the situation renders reasonable to employ.*" (Emphasis added.)

Here, as in *Southern Air*, the act of God which appellants claim occurred was plainly foreseeable and its effects could have been avoided by the taking of reasonable precautions, as for example, the installation of pumps. *See also Brantley v. Tremont & Gulf Ry. Co.*, 226 La. 176, 75 So.2d 236 (1954) (where defendant's negligence concurred with excessive rain in causing damage, defendant could not avail itself of the act of God defense).

ing about, an inch of water, two inches of water, or what?

"A Some parts of it were perhaps up to the running board on a Volkswagen that was it. I think that was the deepest I saw it. It may have been an inch above the running board but it wasn't up to the window or anything like that. It was the running board or just above on several cars. On other cars it was halfway up to the hubcaps. On others up to the bottom of the wheel rim and different areas. We were covered in different amounts of water.

" . . . .

"Q Did that appear to be rain water?

"A It appeared to be rain water, I thought it was. I had no comprehension or imagination that it could be anything but rain water, and I still think it was rain water."

In his deposition of May 18, 1976, Earl Grubbs, an employee of Volkswagen, testified that some of the flood damaged cars contained watermarks as high as the seat cushions.

We hold that this and other summary judgment evidence contained in this record establish, as a matter of law, that the defect in the drainage system at Higgins caused the rainwater (which mixed with sewage) to accumulate in certain areas of the yard and flood the cars stored in those areas. The summary judgment rendered against Robertson, holding him liable for damages, was therefore proper, since Robertson knew of the defect, and neither remedied it nor disclosed it to his lessee, which was ignorant of it.

**B. CCC**

■ Appellants' next contention is that the district court erred in holding CCC liable for damages as a compensated depositary. Appellants' primary argument is that the normal rules governing the depositor-depositary relationship should not govern here because the car hauling agreement between Volkswagen and CCC *required* CCC to store the cars at Higgins. In other words, appellants say that CCC should not be held negligent, and thus liable for dam-

ages, since it had no control over the location where the cars were stored. Although in another factual context this argument might be meritorious, we feel that CCC's relationship with Robertson defeats its application here.

The record shows that Robertson is the sole stockholder, president, and chief executive officer of Willard E. Robertson Corporation, of which CCC is merely an administrative division. Also, as is shown in part II.A., *supra,* Robertson knew that Higgins would have no drainage system in the event of a hurricane threatening the New Orleans area, or if, for any other reason, the water level in the Michoud Canal rose above the level of the drainage culverts. Robertson possessed this knowledge at the time the lease agreement and the car hauling agreement of June 1974 were signed, and it is undisputed that this knowledge was never disclosed to Volkswagen, which was ignorant of these matters.

■ Under Louisiana law, a corporation is bound by the knowledge that its officers and agents acquire respecting its affairs and business. *Martin v. Schwing Lumber & Shingle Co.,* 228 La. 175, 81 So.2d 852 (1955); *National Park Bank v. Concordia Land & Timber Co.,* 159 La. 86, 105 So. 234 (1925) (knowledge of president of corporation relating to its affairs and business is knowledge to the corporation).

Here, the record shows that Robertson's corporation had used Higgins as a storage site for its cars since 1965. The information Robertson obtained respecting the defective drainage system at Higgins was therefore information affecting or relating to the affairs and business of his corporation, and did not concern him solely as the owner of the land. In view of this knowledge, CCC, the compensated depositary, had a duty to disclose to the depositor, Volkswagen, the existence of the defective drainage system so that Volkswagen could have insisted that drainage pumps or other appropriate devices be installed, installed such devices itself, or taken other action to have the cars stored at a different site. Moreover, in the absence of such disclosure, CCC having

knowledge of the defect, was under a duty to install pumps or other auxiliary or back-up drainage systems to protect its deposit. As held by the Supreme Court of Louisiana in *Laubie v. Sonesta International Hotel Corp.,* 398 So.2d 1374, 1377 (La.1981), the duty of the depositary is more onerous than that owed under a tort-feasor standard of care, particularly where, as here, the depositary is compensated. Thus, where the compensated depositary is concerned, negligence may be predicated on its failure to take preventive measures demanded by the exercise of care. *Federal Insurance Company v. C & W Transfer & Storage Co., Inc.,* 282 So.2d 563, 565 (La.App. 4th Cir. 1973); *Grabert v. James C. Noel Flying Service, Inc.,* 360 So.2d 1363, 1369 (La.App. 3d Cir.), *writ denied,* 363 So.2d 536 (La. 1978).

We hold that the duty of CCC, as a compensated depositary, was, in effect, enlarged by the knowledge of its president, Robertson, that the drainage system at Higgins was defective. Charged with this knowledge, CCC was required to disclose or to take appropriate preventive measures, which it failed to do. *See United States Fidelity & Guaranty Company v. Allright Shreveport, Inc.,* 256 So.2d 479, 482 (La. App. 2d Cir.1972) (responsibility of parking garage company enlarged by knowledge of its employees that subsequently stolen clothes were in a car accepted for storage by the garage); *General Accident Fire & Life Assurance Company v. J.F.D.L., Inc.,* 148 So.2d 857, 859 (La.App. 4th Cir.1963) (responsibility of compensated depositary may be enlarged by actual or constructive notice). *See also Travelers Insurance Co. v. General Auto Service, Inc.,* 220 So.2d 738, 740 (La.App. 4th Cir.1969).

Appellants, however, relying on LSA-C.C. 2939, assert that the damage was caused by the rain associated with the impending hurricane; that is, an "overpowering force" within the meaning of article 2939. The district court, however, found that the hurricane did not cause the dam-age, but that the cause was "the absence of pumps on the property that would have alleviated the rainfall on it." Based on the record before us, this finding is not clearly erroneous. The record shows that the hurricane, though threatening the New Orleans area, turned and did not strike it. The rainfall was spread over a three-day period, and although stipulated to be heavy, it was not the unusually heavy rain that often occurs with hurricanes.[22] Moreover, it is reasonably inferable from the evidence respecting the height of the water accumulation which flooded Higgins, that the presence of pumps would have prevented the damage that occurred to the cars.

### III.

### DAMAGES

Frankfurter, Volkswagen's insurer, paid Volkswagen $642,631.60 for the damage and expense incurred in connection with the 368 flood and sewage damaged cars. Frankfurter then brought this suit, in its capacity as Volkswagen's subrogee, to recover the amount it had paid to Volkswagen. Volkswagen also joined in the suit to recover its uninsured loss of $5,000, which was the deductible amount under Frankfurter's policy. The district court's final judgment awarded the plaintiffs $647,631.60, the exact sum of Frankfurter's payment and of Volkswagen's deductible loss.

### A. STANDARD OF REVIEW

█ Under Louisiana law, a subrogee of the owner of a damaged car can recover no more than the owner could recover if he were plaintiff. *Potomac Ins. Co. v. Blaise,* 181 So. 629, 631 (La.App.—Orleans 1938). Hence, Frankfurter stands in Volkswagen's shoes and is entitled to recover from the appellants the damages sustained in connection with the cars; but Frankfurter, like Volkswagen, was bound to prove the amount thereof. "The amount paid by the insurer under the policy provisions to its

---

**22.** We also note that there was no contention or evidence that this rainfall caused any flood-ing on the other property surrounding Higgins.

assured is not the criterion." *Hardware Mutual Casualty Company v. Ber,* 96 So.2d 96, 99 (La.App.—Orleans 1957). *See also Northwestern Mutual Fire Association v. Allain,* 226 La. 788, 77 So.2d 395, 399 (1954) (subrogees of homeowner whose home was damaged by fire possessed no greater rights than the owner, and were entitled to recover only the amount that the owner could have recovered from the defendants); *Royal Ins. Co. v. Romain Motor Co.,* 10 La.App. 1, 120 So. 261, 262 (1929) ("the mere fact that an insurance company sees fit, in adjusting a loss with its assured, to agree with him on an arbitrary amount, not based on actual proof, does not render the party responsible for the loss liable for that amount, or, in fact, for any amount not actually prove[d]").

Under Louisiana law, the liberal rule, which holds that when a plaintiff has clearly suffered damage the trial court is given broad discretion to fix damages even in the absence of specific evidence of the amount of the damage, "does not apply as fully in automobile damage cases where the items of damage are peculiarly within the knowledge of specialists." *Derouen v. Department of Transportation and Development, Office of Highways,* 392 So.2d 765, 769 (La.App. 3d Cir.1980). *See also Lambert v. Allstate Insurance Company,* 195 So.2d 698, 701–02 (La.App. 1st Cir.1967) (an automobile damage case "does not fall within the category of an exceptional, unusual or extraordinary situation in which damages are not susceptible of specific determination. Here the damage is readily capable of being determined in specific amount"). Thus, in Louisiana, it is "well established that claims for damages or expenses incidental to repair of automobiles which are of a speculative nature and not supported by sufficient evidence, are properly disallowed." *Breeland v. New Amsterdam Casualty Company,* 142 So.2d 514, 517 (La.App. 1st Cir.1962).

With these principles of Louisiana law in mind, we now examine appellants' contentions of error regarding the district court's damages award.

## B. SEWAGE DAMAGE

Appellants' initial contention is concerned both with liability and damages. The appellants assert that the district court erred in assessing against them any damages caused by the sewage which came out of the ruptured four-inch sewer line underneath Higgins. Appellants argue that the district court, in its hearings on liability, held them liable only for flood damage, and that it was therefore error for the final judgment to include an award of damages caused by sewage.[23] We disagree.

It is undisputed that the amount of sewage that seeped out of the ruptured sewer line onto Higgins was not of sufficient volume, by itself, to flood Higgins or to enter or cause any damage to the cars stored there. It is also undisputed, however, that the rainwater which accumulated in certain areas of Higgins, particularly near the toe of the levee, as a consequence of the lack of drainage on the yard, mixed with the sewage and rose high enough to cause both floodwater and sewage to enter the cars parked in those areas, and that, but for this accumulation of rainwater, the sewage would never have entered the cars. Hence, it is clear that appellants' negligent failure to remedy the drainage defect at Higgins was a proximate cause of all the complained of damage.

The district court, in recognizing this, granted summary judgment against Robertson, holding him "*liable for the damages suffered by VWOA and its subrogee as a consequence of the flooding of the property.*" (Emphasis added.) In holding CCC liable for damages, the district court left the question of sewage damage "to the trier of fact on assessment of damage."[24] These referenced statements plainly show that,

**23.** In their brief, appellants assert that the presence of sewage in the floodwater greatly added to the damage. This assertion, however, is not supported by the evidence. The only item of damages shown to be related primarily to the sewage damage, and to be assessed against

appellants, was the expense of $5,549.50 incurred in connection with the fumigation of the damaged cars by Franklynn Pest Control Company.

**24.** *See* note 13, *supra.*

contrary to appellants' argument, the district court in fact held them liable for the *entire* damage, including the sewage damage, suffered *as a consequence* of the flooding, and that whether any damage caused by the sewage could be separated out and not assessed against the appellants was a question to be determined by the Special Master during the hearings on damages.

While the evidence showed that sewage was present in some of the cars, it likewise showed that this was caused by the flooding, and that but for the flooding the sewage would not have entered any of the cars. In this sense, the sewage line leaks were not the sole proximate cause of *any* car damage. When sewage was present it was accompanied by flooding. The flooding itself caused damage to all the cars. Apart from one relatively minor arguable exception (see note 23, *supra*), there was no evidence by which the Special Master could have separated the amount of damage which would have resulted in any event from the flooding, had it not been accompanied by sewage, from that which resulted under the circumstances as they actually occurred, with the flooding carrying sewage with it. If appellants wished to pursue this contention, it was their burden to produce such evidence and to secure findings on which they could base their argument, of doubtful merit in any event under the facts here, that they were entitled to a reduction of the total assessment of damages against them because of the sewage damage. This they failed to do.

Moreover, at the trial on damages, appellants not only made no effort to avoid the assessment of the sewage damage,[25] but they also did not attempt to secure the findings legally required to shift responsibility for such damage to NASA, Mason-Rust, or the Sewerage Board. This failure also defeats appellants' alternate argument that any damages award rendered against them should have been reduced by three fourths, since plaintiffs settled with the Sewerage Board, NASA, and Mason-Rust.

■ Generally, this Court refuses to consider issues not raised below. An exception is usually made where the newly raised issue concerns a pure question of law and a refusal to consider it would result in a miscarriage of justice. *Coastal States Marketing, Inc. v. Hunt,* 694 F.2d 1358, 1364 (5th Cir.1983). If, however, consideration of the newly raised issue in the trial court would have resulted in additional facts being developed there, the rationale for the application of the general rule applies, and the issue will not be considered by the appellate court. *Hall v. Board of School Commissioners of Mobile County, Alabama,* 681 F.2d 965, 970 (5th Cir.1982); *Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1146 (5th Cir.), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982).[26]

■ Here, plainly the issue of whether Volkswagen, the Sewerage Board, NASA, or Mason-Rust were responsible for maintaining the sewage line and/or responsible for the damage caused to the cars by the sewage is not purely a legal question, but is dependent upon further factual findings. As to Volkswagen, we find no attempt by appellants at the damages hearings to have the assessment of damages against them reduced by an amount attributable to the sewage damage. Nor was there any adequate attempt on appellants' part to have the responsibility for the sewage damage shifted to the Sewerage Board, NASA, and Mason-Rust. Appellants never filed any cross-action against them, and even after

---

**25.** The only contested issues of material fact that were listed in the pretrial order for the damages hearings were "[w]hether plaintiffs mitigated damages," and "[w]hether the repair work actually performed by Volkswagenwerk A.G. was necessary." In their "Suggested Findings of Fact," appellants made no request for findings respecting the sewage damage, nor did they in their "Objections to the Proposed Findings, Conclusions and Recommendations of the Special Master," specifically make reference to, or complain of, the assessment of the damage caused by the sewage against them.

**26.** *See also Local Union No. 59, Int'l Bhd. of Elec. Workers, AFL–CIO v. Namco Elec., Inc.,* 653 F.2d 143, 146 (5th Cir.1981); *United States v. Unum, Inc.,* 658 F.2d 300, 305 (5th Cir.1981); *Hadra v. Herman Blum Consulting Eng'rs,* 632 F.2d 1242, 1245 (5th Cir.1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1983, 68 L.Ed.2d 301 (1981).

Volkswagen had settled with them, appellants made no attempt to have them adjudicated as either solely responsible for the sewage damage or responsible as joint tortfeasors.

For appellants to have been entitled to the proportionate reduction of damages they seek here for the first time on appeal, as a result of the settlement and the release of NASA, Mason-Rust, and the Sewerage Board, it was incumbent upon appellants to have proved that the released parties were joint tort-feasors. *Raley v. Carter,* 412 So.2d 1045, 1047 (La.1982); *Chesson v. American Hardware Mutual Insurance Company,* 412 So.2d 186, 190–91 (La.App. 3d Cir.1982). In the proceedings below, however, appellants offered no evidence, and sought no findings, that the released parties were guilty of negligence which proximately caused the sewage damage to the cars. *Papania v. Aetna, Casualty & Surety Company,* 291 So.2d 908, 911 (La.App.3d Cir.), *writ denied,* 294 So.2d 835 (La.1974); *Nevels v. Hendrix,* 367 So.2d 33, 37 (La.App. 4th Cir.1978).

We therefore hold that the Special Master and the district court, in assessing damages for sewage damage against appellants, did not commit reversible error.

## C. MEASURE OF DAMAGES AND SUFFICIENCY OF THE EVIDENCE

██ Appellants' next contention of error focuses upon the method by which the Special Master sought to calculate the damage and the expense incidental to the repair of the 289 Volkswagens which were returned to West Germany for repair at various Volkswagen repair shops.

As stated in part I.E., *supra,* the Special Master, in his initial report, found that the cost of repair per car for 235 of the 289 cars returned to the repair shops in West Germany was $400.[27] The district court, however, recommitted the case to the Special Master for further findings on the loss in market value of "the repairable vehicles," and the cost of repair for interior and bodywork on "the repairable vehicles."

On reconsideration, the Special Master purported to arrive at the loss in market value and the repair cost to all 289 cars by the following method:

First, the Special Master subtracted the stipulated "salvage value" per car, which was $1,197, from the stipulated insured value per car, which was $2,444.[28] He then took the difference, which was $1,247, and subtracted from it the repair cost per car, which he found to be $885, to arrive at the loss in market value per car, $362. In effect, what the Special Master actually did, therefore, was simply to award plaintiffs the difference between the insured value of the cars, and their salvage value, in addition to the expense incurred in transporting them back to West Germany for repair at the Volkswagen repair shops, which was $397 per car. Appellants argue that this method of calculating the loss in market value was erroneous. We agree.

27. The Special Master found that the remaining 54 cars were "constructive total losses." These cars were repaired and resold in West Germany. The Special Master found that the loss attributable thereto was $67,387.14 or $1,247.91 per car.

28. In the pretrial order of March 22, 1978, the parties made the following stipulation regarding the 289 Volkswagens: "[The] 289 Volkswagen automobiles with a cost of $706,369.21 [$2,444 per car] were returned to the Volkswagen factory in Wolfsburg, Germany for the salvage value of $346,007.00 [$1,197 per car]." As to the salvage value, this figure was based on the adjustment of the claim between Volkswagen and Frankfurter. As a result of negotiations in Wolfsburg on December 3, 1974, the figure agreed on was 860,000 deutsche marks.

An exchange rate of 2.4855 deutsche marks per dollar was used, and its propriety is adequately supported by the record. The 289 Volkswagens were sold to Volkswagen company employees in West Germany and used as company cars. *See* note 31, *infra. See also Boyer v. Walker-Roemer Dairies, Inc.,* 402 So.2d 118, 119 (La.App. 3d Cir.1981) (owner of truck which was demolished in collision was entitled to recover the stipulated value of the truck); *Bolin v. Cuyler,* 18 La.App. 138, 136 So. 779, 781 (1st Cir.1931) (deducting from insurable value of car before accident the salvage proceeds received for the car after the accident held a fair method of computing the damage). Although appellants question the meaning of this stipulation, given our disposition of this aspect of the case, we do not have to construe it.

Whether a loss in market value of these 289 cars was, in fact, recoverable as an item of damages depends on whether the cars were repairable or were total losses.

"As a general rule, recovery in cases of damages to an automobile is limited to cost of repair. Thiery v. Motors Insurance Corporation, La.App., 255 So.2d 181; Cloney v. Travelers Insurance Company, La.App., 253 So.2d 83. Where, however, a vehicle is totally destroyed, or so badly damaged that the cost of repair exceeds its value, the measure of damages is the value of the vehicle less its salvage value. Bernard v. Fidelity & Casualty Company of New York, La.App., 186 So.2d 904; Cloney, above. Where an award of cost of repair is the measure of damages in a case involving damages to an automobile, additional damages may be recovered for diminution of value by virtue of the vehicle having been involved in an accident, provided proof of such diminished value be made. Gary v. Allstate Ins. Co., La. App., 250 So.2d 168." *Traders & General Insurance Company v. Robison,* 289 So.2d 178, 185 (La.App. 1st Cir.1973).

*See also Cheramie v. Jones,* 327 So.2d 601, 602 (La.App. 4th Cir.1976).

■ Under Louisiana law, a car is deemed economically unrepairable, or a total loss, when the cost of repair exceeds the value of the car before the accident. To prove a total loss, a plaintiff must introduce evidence not only of the car's value before the accident, but also as to how much it would cost to repair the car, and its salvage value if not repaired. *Roy v. Commercial Union Assurance Company,* 385 So.2d 1273, 1276 (La.App. 3d Cir.1980).

Here, taking the values used by the Special Master, and applying to them the rules enunciated above, it is clear that the cost of repair per car, based on the testimony of Dieter Dietrich, at $885, does not exceed the value per car before the flood, which was stipulated to be $2,444. Nor does the repair cost per car even exceed the stipulated salvage value per car, $1,197.[29] We hold, therefore, that under the values stipulated and accepted by the Special Master, that the Special Master, in calculating the damage to the 289 cars by taking the difference between their insured value and salvage value, applied the incorrect measure of damages. Under Louisiana law, the cost of repair plus the "as-repaired" depreciation in market value was the correct measure. The Special Master's attempt, as described above, to calculate the loss in market value per car merely by subtracting the repair cost per car from the difference between the insured value per car and the salvage value per car is not based, in any way, on evidence as to the market value of the cars as repaired. And, as the appellants point out, the loss in market value is not necessarily dependent on the cost of repair. The figure derived from the Special Master's calculation is therefore speculative.

■ However, we do find evidence in the record to support the Special Master's finding that the factory repaired cars could not be sold as new. Thus, plaintiffs proved that some loss in market value of these cars in fact occurred. But we find insufficient evidence in the record showing the amount of this loss.[30]

---

29. Nor does the sum of the cost of repair and the salvage value exceed the predamage value.

30. Plaintiffs' Exhibit 71, entitled "Summary of Costs of Factory Order No. 208303," states that "according to the letter dated" November 2, 1975 (which is not in evidence or otherwise identified or described) the "Inland Net Price" applicable to "liquidating of 290 VW" is 5,150.-78 deutsche marks per car, or approximately $2,088. There is no evidence indicating what is meant or referred to by "Inland Net Price," or how the figure was calculated or arrived at. As previously noted, the cars were sold by Volkswagen to its employees in West Germany

(*see* note 29, *supra*). If the mentioned "net price" refers to these sales, this would not constitute any evidence of market value, as there is no evidence of how the particular price was arrived at or any other circumstances concerning it or the sales.

Plaintiffs' Exhibit 144, dated November 17, 1977, contains a notation that the average "mercantile loss in value per vehicle" is 508.82 deutsche marks, or approximately $206. There is no evidence explaining what is meant by "mercantile loss in value," or how the figure given therefor was arrived at. There is no evidence concerning the preparation of either Exhibit 71 or Exhibit 144.

Regarding the cost of repair, the Special Master's finding, as noted earlier, was expressly based on the testimony of Dieter Dietrich, a marine claims adjuster for Frankfurter, Volkswagen's insurer. Although not mentioned by the Special Master, Gerhard Willkner, Volkswagen's chief director in charge of its repair shops in West Germany,.testified on cross-examination that the average repair cost per car was "approximately two thousand to two thousand one hundred marks," or between $810 and $850 per car.[31]

In *Lambert v. Allstate Insurance Company, supra,* the Louisiana Court of Appeals set forth the Louisiana law regarding the type of proof necessary to sustain a recovery for the cost of repair:

"Damages may be predicated on estimation only when the loss has not been repaired. If the damaged property has been restored to its former condition by repair, the proper basis for assessing the damage is the repair bill. Gambrell v. Audubon Insurance Co., La.App., 115 So.2d 727. Plaintiff must produce the best evidence available in support of his claim. Sutherlin Sales Co. v. United Most Worshipful, Etc., La.App., 127 So.2d 253.

"Where invoices, statements or records of accounts expended in the repair of damages are in the possession of plaintiff or are available or attainable, such records constitute the best evidence and should be offered in proof of plaintiff's claim. In the event such evidence is not available or attainable, proof of loss should be made by offering the testimony of the person furnishing the material, labor or supplies when such testimony may be produced. Upon proper showing that the testimony of such persons is not available, the court may allow a claim for damages, upon the production of such available testimony as fairly and reasonably establishes plaintiff's claim under the circumstances. Tooker v. Zuberbier, La.App., 105 So.2d 744." 195 So.2d at 700–01.

*See also Mut v. Newark Insurance Company,* 289 So.2d 237, 254 (La.App. 1st Cir. 1973), *writs denied,* 290 So.2d 910, 912 (La. 1974) (where damaged property was actually repaired, the case was remanded for new trial on damages where property owners failed to show unavailability of invoices, statements, or the testimony of the parties who performed the repairs).[32]

**31.** Willkner testified that this figure included the 1,000 deutsche marks (or about $400) per car cost of converting the damaged cars to West German specifications so that they could be sold and driven in West Germany, and that these costs would not have been incurred had the cars been repaired and sold in the United States. *See* note 37, *infra.* Willkner added, however, that by repairing the cars in West Germany, Volkswagen was able to reduce the repair cost by using factory "seconds."

**32.** That the trial court, then District Judge Rubin, after the trial on CCC's liability, realized that actual invoices would be required to prove the damages sustained is shown by the following colloquy between the court and Volkswagen's counsel immediately following the trial:

"THE COURT: [T]he matter will be alloted to that Magistrate as a Special Master to hear evidence on and make findings of fact and recommendations as to the assessment of quantum of special damages.

"I suppose, unfortunately, it may be necessary to do that virtually on a vehicle-by-vehicle basis. And, as I recall, there are almost 400 vehicles involved. Is that correct?

"MR. DENTON: There are 368 automobiles that are involved, Your Honor, and that the presentation in that, if that is going to determine, really, whether the Court will request the vehicle-by-vehicle basis, there are two groups of vehicles, the first group of vehicles which is, I believe, 76 vehicles that were constructed, were total loss vehicles and which were sold for salvage value, I believe. It's—that would be handled as a group with the testimony of the surveyor and adjuster.

"THE COURT: Still, that has to be on a vehicle-by-vehicle basis for somebody to say that Vehicle A was a total loss and Vehicle B was a total loss and Vehicle C was a total loss.

"So, I suppose that the appropriate way for you to prepare for that and the only way it can be done with any degree of efficiency is for someone to sit down and start doing some clerical work handling that, to make 378 cards or pieces of paper and with respect to each vehicle state what the evidence is, that it was a total loss, what the salvage value received and what the fair market value was.

"With respect to vehicles that were in some way repaired, renovated, or salvaged,

Here, it is undisputed that the repairable cars returned to West Germany in November 1974 were, in fact, repaired. At trial, plaintiffs introduced into evidence the pretrial deposition testimony of Wolfgang Weber, a field engineer in Volkswagen's technical service department. Weber translated and identified 296 invoices showing the actual repairs made to the flood and sewage damaged cars, which had been returned to West Germany for repair. The invoices were divided into eight "anlages," which according to Weber, showed that 126 cars were repaired at the Volkswagen repair shop at Wolfsburg, 100 at Neckarsulm, 32 at Ingolstadt, and the remaining 38 cars at an undisclosed repair shop. Weber, how-

then I think it would be necessary for you to prepare a description of what was done and how the cost or value of that was arrived at. Until that's done, I don't suppose the defendants can intelligently determine whether they're going to contest every one, single one of the 378 vehicles or they're going to say, 'Reserving our right, we'll contest 78 vehicles and agree with you on 300' or whether they'll say, 'Reserving our rights, we'll agree with you on all of them.'

"So I suppose that the next step, unless you've already done this, will be to prepare something like that vehicle by vehicle. Certainly, that's the only way the Magistrate is going to be able to understand it, not deal with 378 undifferentiated vehicles, but go through it vehicle by vehicle, although some of that testimony, obviously, may embrace more than one vehicle.

"So I think perhaps you need to start on a rather extensive clerical job in addition to the evidentiary job.

" . . . .

"But the first step is a marshaling of the evidence in some form that it can be dealt with, and there's no avoiding that. So we might as well be about it. There's no way the case can be heard, considered, and decided any other way.

"Perhaps that will lead to some stipulations. Perhaps not. But if it doesn't lead to any stipulations, it will lead to the presentation of evidence in a manner that, first, the Magistrate can understand it; second, the defendant can oppose it; and, third, if there's an appeal from the Magistrate's ruling, the Court can understand what it is that is involved. And I say that because I've been through a few cases that involve this kind of evidentiary presentation, and if you don't do it in that way, we'll have another six volumes of record and not know where we are."

ever, provided no testimony as to the average cost of repair per car as reflected by the invoices.

Moreover, neither Dietrich nor Willkner's testimony was shown to be, in any way, based upon or related to these invoices, and no one other than Weber, whose only purpose was to translate and identify the invoices, referred to or relied upon them in their testimony.[33]

Our review of these invoices indicates that the repair costs reflected thereon appear to be substantially below the average cost of repair per car accepted by the Special Master, which was 2,200 deutsche marks or $885.[34] Because the testimony on which the Special Master based his findings

Unfortunately, Volkswagen's counsel failed to heed Judge Rubin's thoughtful admonition.

**33.** Dietrich's testimony, when read as a whole, together with the other evidence in the record strongly suggests that his testimony, that the average cost of repair per car was 2,200 deutsche marks, was based upon estimates.

The Special Master, in his report, also cited the testimony of Earl Grubbs, who testified that the repair cost per car was $1,000.86. Grubbs' testimony is not related to the invoices introduced at trial. Moreover, on cross-examination, Grubbs testified that the cost of repairs he testified to were the retail prices charged in the United States for parts and labor. Hence, Grubbs' figures do not represent the actual repair costs, particularly in light of the West German conversion charge incurred which was justified on the basis of avoiding costs that would have been incurred in the United States. See note 31, supra.

**34.** The invoices are far from self-explanatory, and there is no testimony (or other evidence) explaining them or demonstrating how they support any given average repair figure per car.

Exhibit 71 contains a statement to the effect that the average repair cost for 290 Volkswagens was 2,175 deutsche marks, or approximately $882. On the other hand, Exhibit 144 states that the per car repair cost "including retrofitting in accordance with German traffic and registration laws" was 1,641.85 deutsche marks, or approximately $665. No breakdown, or explanation, of the referenced figures is given on either exhibit. We have found no testimony resolving this apparent conflict in plaintiffs' exhibits, nor any evidence showing the basis for the mentioned figures given on them or explaining how such figures were arrived at. Nor is there any evidence concerning the preparation of the exhibits.

was not shown, in any way, to be based upon or related to the actual repair costs as reflected in the invoices introduced at trial, it is doubtful that there is sufficient evidence to support the Special Master's finding of the cost of repair per car.

However, even if there were sufficient evidence to support this finding, it is unclear from the Special Master's findings whether the plaintiffs would be entitled to recover the full amount of the repair costs, because of the failure to mitigate the damage.

## D. MITIGATION OF DAMAGE

 In his initial "Findings, Conclusions and Recommendation," the Special Master found that:

> "3. Water was standing in some automobiles at the time of the various inspections in the days and weeks following the flood. Similarly, floor covering in some automobiles was wet and soggy. No effort was made to mitigate or minimize the continuing deteriorating effects of same over the two month period of time investigations and surveys were being conducted to determine the final action to be taken.
>
> " . . . .
>
> "9. The extent of damage . . . [to the 289 repairable cars that were sent back to West Germany for repair], which were unattended, except for inspection, for two months could have been mitigated or minimized by plaintiffs by draining water from them, as the evidence indicated, by drilling holes in the flooring. Additionally, flooring carpets and mats could have been removed; the automobiles could have been aired out; the seats could have been removed and dried; the engine oil could have been drained and refilled. Plaintiffs failed to thus minimize the extent of their losses." [35]

Based upon these findings, the Special Master concluded that "[d]efendants estab-lish[ed] that plaintiffs could reasonably have mitigated and minimized their damages."

To adjust the damages award for the plaintiffs' failure to mitigate, the Special Master found the cost of repair for 235 of the 289 Volkswagens determined to be repairable, was $400 per car. This finding was based on testimony that "immediately post hurricane" these cars were repairable at a cost of $300 to $500 each. The Special Master also took into account the plaintiffs' failure to mitigate by disallowing any recovery for the transportation expenses incurred in returning these 235 Volkswagens to West Germany. The Special Master, however, made no findings, reference to, or adjustment for the effect of the failure to mitigate on the remaining 54 cars which were sent back to West Germany, or on the 76 Volkswagens and three Audis that were claimed to be total losses.

Plaintiffs objected to these findings insofar as they concerned the 235 Volkswagens, by arguing that the Special Master erred (1) "in failing to take into account the fact that subsequent to the repair these vehicles would not have been new vehicles nor would they have been saleable as new vehicles and would have suffered substantial depreciation in total value"; and (2) in failing "to consider and account for the obligations of defendants as compensated depositees with respect to the mitigation of damages, and their interference with plaintiffs' efforts to mitigate damages." In a subsequent memorandum in support of their objections, plaintiffs argued that there was no evidence to support the finding that the 235 Volkswagens could have been repaired at a cost of $400 per car. Plaintiffs attacked the testimony of Francis Boudreaux, upon whose testimony this figure was largely based, as encompassing only the mechanical repairs to the cars, and not including the replacement of necessary interior parts and bodywork; that is, the cost of replacing "interior panels, sandproofing, insulation,

---

[35] The record indicates that instructions were given by Volkswagen to remove the water from the cars on October 3, 1974 so that the cars could be disinfected. The record does not indicate exactly when these instructions were actu-ally carried out. The record does, however, show that the cars were disinfected by Franklynn Pest Control Company during October 7–12, 1974.

upholstery, seats, seat cushions, and other parts which were subjected to water and sewerage ...."[36] Finally, plaintiffs argued that the Special Master had failed to consider evidence that the repair facilities and personnel were not available in the New Orleans area at the time period involved, and that the Special Master therefore erred in disallowing the transportation expenses incurred in returning the 235 Volkswagens to West Germany.

The district court, after considering these objections, recommitted the matter to the Special Master, ordering him to make "additional Findings of Fact assessing the dollar amount of damages attributable to the loss [in] market value on the repairable vehicles" and to make "additional Findings of Fact concerning the repair cost of the repairable vehicles which includes the necessary body work, replacement of panels, carpets, mats, sandproofing and other body work necessitated by the flooding."

On remand, the parties agreed that no additional testimony was needed. Thereafter, the Special Master issued his "Supplemental Findings of Fact," wherein he found the repair cost for all 289 Volkswagens returned to West Germany to be $885 per car; the loss in market value to be $362 per car; and the transportation (and some minor other) expense incidental to the repair to be $397 per car. By making these findings, the Special Master, as stated earlier, gave plaintiffs the entire amount of damages sought by them. The Special Master made no mention of the plaintiffs' failure to mitigate the damage, and he provided absolutely no reasons for any change of position respecting the failure to mitigate and its effect on the damages award. Furthermore, the Special Master gave no explanation for awarding plaintiffs all the transportation costs incurred in connection with the return of the 289 repairable cars to West Germany. We find this apparent, *sub silentio* change in position on the part of the Special Master, without any express acknowledgement thereof or explanation therefor and without any attempt to resolve the conflict in the evidence on these matters, troublesome, and we think it effectively precludes review of this facet of the case, especially in view of the evidence in the record which supports his original express finding, which was never reversed or retracted, that plaintiffs failed to mitigate the damage, and his original implied finding that had steps been taken, much of the interior work and bodywork would not have been necessary. We also note that the Special Master failed to explain his change in position with regard to the transportation costs and expenses.[37] The findings are in-

**36.** A report by H.C. Graham on October 9, 1974 of an October 1, 1974 meeting of Frankfurter and Volkswagen officials in New Orleans stated as follows:

"After having examined the vehicles in the field (after they had been segregated from the other 3,000 to 4,000 vehicles) we came up with the following figures:

"30 vehicles being total losses.

"90 vehicles being questionable as to whether or not they could be repaired and with repair estimates running between $600 and $800 average.

"235 vehicles which were damaged to varying degrees which were in our opinion of such a nature that they could be repaired and sold as new vehicles without difficulty.

"These figures have since changed as there were several more inspections made with the idea, of course, of always cutting down the number of cars which might be involved.

"....

"We so informed Mr. Dietrich and while we were surveyors only, we told him, in our opinion, that while there was no doubt that the 30 were total losses and there was some doubt in our minds as to whether we could salvage any significant number of the 93 which might or might not be and on which there was a question mark. We are absolutely certain of ourselves that the 235 could be cleaned and put back on the market at a gross figure of approximately $500.00 per car."

**37.** In this respect, we are also troubled by the failure of the Special Master, in his original report, to explain why the transportation costs and expenses were awarded plaintiffs for the 54 "constructive total loss" cars returned to West Germany when such costs were denied as to the other 235 cars. The record contains evidence that the repairable cars could have been repaired in the New Orleans area, but, on the other hand, there is also evidence that these cars could have been repaired faster and more cheaply in West Germany, and that the cars could not be sold in the United States. The Special Master, however, in his reports, does not touch upon these matters.

adequate, because we are left with a finding that plaintiffs failed to mitigate damages, but there are no findings applicable to the damages as last determined respecting how much these would have been reduced had plaintiffs taken steps to mitigate, nor even any findings that this cannot be ascertained.

As to the arguments advanced by plaintiffs in their objections to the Special Master's first report, that is, that the appellants prevented any efforts to mitigate the damage, and that CCC, as a compensated depositary, had the obligation to see that the cars were drained, the record contains testimony by Robertson that the plaintiffs told his personnel to "leave the cars alone." Captain Wedekind, a marine surveyor for Toplis & Harding, Inc., which performed marine surveying work for Volkswagen at Higgins, also testified that he himself asked Kendricks, a Robertson employee who was in charge of the Higgins yard, several times not to interfere with the inspections of the damaged cars:

"Q And it was all under your jurisdiction, and you-all were going to take over?

"A Not—no, not taking over. I suggested [to Kendricks] that the Volkswagen of America employees would be in charge of this particular inspection.

"Q Well, until you-all were finished [with] your inspection, you-all wanted control of that yard, didn't you?

"A No, not of the yard, no, I can't say that. I asked him not to touch the cars we would set aside and leave them alone.

"Q Not to touch any of the cars without your permission?

"A No, I didn't ever say that. I only asked him not to interfere with the cars we marked and set aside as being damaged."

On remand, in determining whether plaintiffs mitigated the damage in this respect, the trial court should consider, *inter alia*, the cost of repair in the United States and other incidental expenses in connection therewith, the transportation expenses to West Germany, the availability of factory "seconds" in West Germany, the cost of conversion to West German specifications, and, of course, the cost of repair in West Germany. *See* note 31, *supra*.

This uncontradicted evidence shows that the flood damaged cars were removed from the control of Robertson and CCC, and that they therefore cannot be said to have obstructed or delayed plaintiffs' efforts to mitigate the damage, nor under these circumstances did CCC, the compensated depositary, have a duty to mitigate the damage when its representatives were told by the depositor to leave its deposit, the damaged cars, alone.

In sum, the failure of the Special Master to explain the reasons for his ultimate refusal to make any adjustment in the damages award, respecting the repair cost of the repairable cars, their loss in market value, and their transportation expenses, to reflect the plaintiffs' failure to mitigate as established by the previous, unretracted finding, and the Special Master's additional failure to explain the effect, if any, of the failure to mitigate on the total loss cars, as discussed below, prevents us from making an intelligent and fair resolution of this question on appeal. The record does not contain adequate findings as required by Fed.R.Civ.P. 52(a).

Given the deficiencies of proof in regard to the cost of repair and the loss in market value of the repairable cars, and given the failure of the Special Master to adequately explain the relationship between the failure to mitigate and those items of damage, we feel that in the interest of justice, this aspect of the case must be retried.

E. THE TOTAL LOSS CARS

As stated earlier, 76 Volkswagens and three Audis were determined to be total losses.

The Special Master failed to clarify the effect, if any, of the plaintiffs' failure to mitigate the damage on the alleged total loss cars.[38] From the record, it is unclear

**38.** At oral argument, plaintiffs contended that the testimony showed that the severity of the damage to the cars was determined only by the level of the water and not by how long the water remained in the cars. While the Special Master did not deal with this contention in his reports, we do note that the record tends to support plaintiffs' contention insofar as it concerns the *mechanical* repair to the cars, but not to the replacement of the carpets, paneling, and other interior work, which would be affected

whether the failure to mitigate affected the number of cars declared to be total losses. In this respect, however, we do note that as the inspections of the damaged cars continued over the weeks following the flooding, the number of cars declared to be total losses steadily increased.[39] The Special Master found that water remained standing in "some automobiles." That the water was not drained from the "questionable" cars and that other measures to dry them out were not taken until sometime after the final inspection was made in early October 1974, support the inference that the failure to mitigate may have increased the number of cars declared to be total losses.

We therefore hold that this aspect of the damages award, along with that concerning the repairable cars and the transportation costs and expenses, should be reversed and remanded for a new trial.

### IV.

### CONCLUSION

Accordingly, we affirm the judgment of the district court insofar as it holds the appellants liable for the flood and sewage damage to the 368 cars stored at Higgins in September 1974. However, respecting the damages award, we reverse and remand for a new trial on damages, to be conducted in accordance with this opinion, so that plaintiffs may produce competent evidence of the necessary elements required to calculate the amount of damages legally recoverable by them as a consequence of the flooding. We also direct the court below to make adequate findings on retrial as to the proper elements of damages, and as to plaintiffs' alleged failure to mitigate the damage and the effects thereof.[40]

by the length of time the water remained in the cars.

**39.** The record shows that on September 26, 1974, the number of total losses was placed at 27, with 93 cars questionable, and 235 cars deemed repairable. On October 1, 1974, the number of total losses increased to 30, with 90 questionable, and 235 repairable. Finally, the number of total losses was increased from 30 to 79 and the number of repairable cars from 235 to 289.

AFFIRMED IN PART, and REVERSED AND REMANDED IN PART.

**40.** The remand we order does not extend to whether appellants are liable for sewage damage; as indicated in part III.B., *supra*, the issues in this regard have been properly resolved adversely to appellants. Of course, with respect to the question of failure to mitigate damages, the required findings on remand apply to any damages for which appellants are otherwise liable, including those of which sewage may have been a cause.